MERLE P. BROOKS AND VERA BROOKS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83488. Filed September 27, 1961.

*Adam Y. Bennion, Esq.*, and *E. Robb Livingston, Esq.*, for the petitioners.

*Donald P. Chehock, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioners' income tax of $3,392.85 for 1955 and $5,399.98 for 1956. The sole question for decision is whether a portion of the purchase price received for the sale of a dental practice is the proceeds from the sale of goodwill or consideration for a covenant not to compete.

### FINDINGS OF FACT.

Petitioners Merle P. and Vera Brooks are husband and wife and reside in Los Angeles, California. They filed joint income tax returns for the years 1955 and 1956 with the district director of internal revenue at Los Angeles.

Brooks has practiced as a dentist in the Los Angeles area since graduating from dental school in about 1932. By 1939 he had come to specialize in the field of orthodontia and in that year he opened his own office in downtown Los Angeles. In 1945 he opened a second office which he moved in about 1950 to a location in North Hollywood some 12 miles north and west of his first office. He opened a third office in 1946 which was located about 18 miles south of the first office.

In 1955 each of the three offices was operated on a clinic basis. Dentists were employed as managers of each of the offices. The downtown office employed about 15 dentists, some of whom worked only part time. The other two offices employed two full-time dentists and another on a part-time basis. Each office had several dental technicians. Brooks divided his time among each of the offices consulting with the other dentists and doing administrative work. As a rule he spent only 1 day, Monday, at the North Hollywood office.

The main feature of Brooks' clinic system was the absence of a personal relationship between the patient and the dentist. This resulted in a larger volume of patients and lower fees than would be normally charged for orthodontic work. In the normal case the patient, usually a child, would be examined on the first visit by a dentist with considerable experience. The required treatment was outlined and the child's parent was told the approximate length of time the treatment would entail and the financial arrangements which could be made. If the parent decided to proceed with treatment, X-rays were taken and models made of the teeth and surrounding structures. These models and X-rays were kept on file and consulted from time to time to determine the amount of progress being made. Dental appliances were placed on the patient's teeth during the first month. The regular treatment began the second month. The average length of treatment was about 2 years. The rates charged by Brooks were substantially less than those of the more conventional

orthodontists who did not use a clinic arrangement. Brooks seldom treated patients himself at the North Hollywood office.

Because the patient was liable to be treated by many different dentists over the course of his treatment, each patient had a treatment card on which the proposed treatment was outlined at the time of the original examination. Each time the patient visited the office the dentist who worked on him referred to the card to see what had been done and entered a description of the current treatment on the card.

Roger Bloch graduated from dental school in 1947 and was employed by Brooks in the North Hollywood office until 1952 when Bloch entered the Navy. Bloch was separated from the Navy in 1954 and returned to the North Hollywood office as its manager. Brooks told Bloch that if Bloch would manage the North Hollywood office he would sell it to him in about a year. Bloch agreed and as manager was paid a salary and a percentage of the net profits of the office. During the year following Bloch's release from the Navy, Brooks and Bloch from time to time discussed a sale of the North Hollywood office and practice to Bloch.

In about June of 1955 Brooks presented Bloch with a draft of a proposed agreement for the sale of the office and practice at a selling price of $240,000. Brooks arrived at this amount by estimating the yearly net income of the office before deducting the manager's salary, $60,000, and multiplying it by 4. The final agreement executed by Brooks and Bloch on June 28, 1955, provided, in part:

WHEREAS Seller [Brooks] desires to sell and Buyer [Bloch] to buy that certain dental office located at * * * North Hollywood, California and all the transferrable assets incident thereto upon the terms and conditions hereinafter set forth,

Now, THEREFORE, Seller and Buyer, in consideration of their mutual promises, do hereby agree as follows:

(1) Seller agrees to sell, assign, transfer, and convey all of his right, title, and interest in and to that certain dental office and practice located at * * * North Hollywood, California, including goodwill, furniture, fixtures, leasehold interest, and any other assets connected with said dental office and practice. Seller and Buyer agree that all accounts receivable and accounts payable earned or incurred in connection with said dental office prior to July 1, 1955, shall be for the account of Seller.

(2) Seller agrees that from and after July 1, 1955, he will not establish a dental office within a radius of five miles of the aforesaid location without first obtaining Buyer's written consent and that Seller shall continue to refer to Buyer those patients from Seller's other dental offices who reside within the aforesaid five mile radius of the office * * *.

(3) Buyer agrees to purchase the aforesaid dental office, its assets and practice, to take possession and control thereof on July 1, 1955, and to release Seller from any liabilities incurred following said date and to pay Seller as consideration for the purchase thereof either (1) the sum of two hundred forty thousand dollars ($240,000.00), payable at the rate of twelve thousand dollars ($12,000.00) per annum over a period of twenty years from the effective date of this Agree-

ment *or* (2) a sum equal to one third of the net income after taxes (as hereinafter defined in paragraph (4) of this Agreement) of Buyer from his dental practice for each calendar year, or part thereof; and the aggregate thereof over a period of twenty years—whichever of these two aggregate sums is the lesser, subject to the following further provisions, * * *

\* \* \* \* \* \* \*

(5) In the event that Buyer sells or receives an offer of purchase, or in the event of Buyer's death and a proposed sale or offer of purchase, Seller shall have the option or right of first refusal, to repurchase said dental office and practice on the same terms, conditions, and price as offered by any bona fide offer of any third party to Buyer or to his assigns, heirs, executor, or administrator; * * *

The covenant not to compete in paragraph (2) of the sale agreement was inserted by Brooks' attorney after the selling price had been agreed upon. It was not requested by Bloch and it had not been mentioned in the discussions leading up to the preparation of the agreement. Brooks and Bloch were on a cordial basis and Bloch would have been willing to purchase the practice without the covenant in the purchase agreement.

Under the agreement Bloch received the work in progress on patients being treated in the North Hollywood office, all records pertaining to them, including treatment cards, all X-rays, models, and the other assets of the office, tangible and intangible. Brooks' name was used by Bloch in connection with the practice. It was kept on the window of the premises for several years after the sale and it was listed in the telephone directory at the North Hollywood address.

On July 1, 1955, Bloch gave Brooks written permission to practice at the North Hollywood office for a period of 6 months. Although the permission was not subsequently extended in writing, Brooks has used the office occasionally as an accommodation to a patient or a relative who lives in the North Hollywood area. Brooks has paid Bloch a token $10 per month for this privilege since the date of the permission to the present time.

For the years 1953, 1954, and 1955, Brooks' records show gross income, salaries paid, other expenses, and net income from the three offices as follows:

| | Gross income | Salaries including bonuses | Other expenses | Net |
|---|---|---|---|---|
| **JEFFERSON BOULEVARD (FIRST) OFFICE** | | | | |
| 1953 | $284,080.29 | $174,479.33 | $48,146.62 | $61,454.34 |
| 1954 | 301,312.76 | 184,644.65 | 47,087.20 | 72,580.91 |
| 1955 | 309,307.21 | 188,025.94 | 47,339.59 | 73,941.68 |
| **NORTH HOLLYWOOD (SECOND) OFFICE** | | | | |
| 1953 | $89,216.35 | $34,097.86 | $8,396.64 | $46,721.85 |
| 1954 | 88,014.35 | 40,462.61 | 8,507.28 | 39,044.46 |
| 1955 (to June 30) | 48,954.75 | 20,999.83 | 6,305.22 | 21,649.70 |

| | Gross income | Salaries including bonuses | Other expenses | Net |
|---|---|---|---|---|
| LONG BEACH (THIRD) OFFICE | | | | |
| 1953 | $85,950.17 | $36,910.53 | $6,520.62 | $42,519.02 |
| 1954 | 110,600.83 | 54,286.55 | 7,354.26 | 48,960.02 |
| 1955 | 133,712.05 | (¹) | (¹) | (¹) |

¹ Amounts not in evidence.

Since entering into the 1955 agreement, Bloch's net annual income after taxes from the North Hollywood office has always exceeded $36,000. Since entering into the sale agreement Bloch has paid Brooks $12,000 each year at the rate of $1,000 per month. In 1955 he paid Brooks $6,000 and in 1956 he paid him $12,000. In reporting these amounts on his income tax returns for those years, Brooks allocated $10,000 of the total selling price ($240,000) to the physical assets which were transferred in the sale. The remaining $230,000 was considered as a capital gain from the sale of goodwill. Thus, on his 1955 tax return Brooks reported $5,749.80 of the $6,000 received from Bloch as eligible for capital gains treatment and on his 1956 tax return he reported $11,499.60 of the $12,000 received from Bloch as eligible for capital gains treatment. The difference between the amounts received and the amounts reported as capital gains income in each year was reported as gain from the sale of business equipment.

In the statutory notice respondent accepted Brooks' allocation of $10,000 of the total purchase price to tangible assets of the practice, but disallowed the amounts Brooks had treated as capital gain from the sale of the North Hollywood practice and determined that it was ordinary income. Respondent explained:

(d) An amount * * * received by you from Dr. Roger Bloch for your agreement and covenant not to establish a dental office within a five mile radius of [the North Hollywood office] and to refer to Dr. Bloch those patients from your other dental offices who reside within the previously mentioned five mile radius result in the receipt of ordinary income, instead of a long-term gain from sale of dental practice as reported on your return since the proceeds were not received from disposal of a capital asset. The ordinary income is computed as follows:

Amount
Gross sales price_____ $240,000.00 * * *

On his income tax returns Bloch has never deducted any part of the payments made by him to Brooks.

OPINION.

Respondent argues that the amounts paid to Brooks under the 1955 agreement are in the nature of rent taxable as ordinary income and not proceeds of a sale. Respondent presents this argument for the first

time on brief. Nothing in the deficiency notice, the answer, or introduced at the trial of the case gives any hint that respondent would challenge the 1955 transaction on the ground that it lacked substance as a sale. In the statutory notice respondent characterized the $240,000 as "Gross sales price." An attempt now to claim that there was no sale is an issue raised for the first time on brief, which we will not consider. *Warner G. Baird*, 42 B.T.A. 970.

Brooks argues that he was the owner of goodwill not dependent on his personal qualifications or skill; that the amount of the sales price in excess of that allocated to the tangible assets of the practice represented the price for that goodwill and that the covenant not to compete was not a separable part of the sales agreement separately bargained for which possessed a value of its own. We agree with Brooks.

In the recent case of *Malcolm J. Watson*, 35 T.C. 203, we discussed in detail some of the factors to be taken into account in arriving at the factual determination dispositive of this case. That case involved the sale of an accounting practice and we said that respondent has conceded "the existence of transferable goodwill may be recognized in connection with the sale of a business or profession the success of which is not dependent solely upon the personal qualifications of the owner." [1] In some respects the present case is a stronger one in favor of the taxpayer than was *Watson*.

The first inquiry is whether goodwill existed. In *Malcolm J. Watson, supra,* we set forth several of the myriad definitions of goodwill which have appeared in prior opinions of this and other courts. Thus, goodwill "is nothing more than the probability that the old customers will resort to the old place" [2] or it is "all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it" [3] or it is "any privilege that gives a reasonable expectancy of preference in the race of competition. * * * Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers" [4] or it is "an opportunity to succeed to the advantageous position of [a] predecessor." [5]

However it may be defined, and there are many ways, it seems obvious that goodwill was present in the North Hollywood practice. The orthodontic practice by its nature required up to 2 years to bring treatment to a successful conclusion. Brooks estimated that there were about 650 active patients at the North Hollywood office being treated as of June 1955, and that about 250 new ones started there during that year. He testified that the source of referrals to the North Hollywood

[1] See Rev. Rul. 60–301, 1960–2 C.B. 15.
[2] *Rodney B. Horton,* 13 T.C. 143, 148, citing *Cruttwell* v. *Lye,* 17 Ves. Jr. 335.
[3] *Ibid.*
[4] *In re Brown,* 242 N.Y. 1, 150 N.E. 581, 582.
[5] *Malcolm J. Watson,* 35 T.C. 203, 213.

clinic was "principally" from other patients and Bloch said that the "great majority" of the patients in that office came as a result of referrals by other patients or their parents because "One parent tells another where they took their children for orthodontic treatment." Bloch further testified that had he attempted to start a practice from scratch it would have taken a long time to establish himself. However, the purchase of Brooks' practice was a good opportunity because he "had possession of all the patients' record cards, the complete mechanics of the operation [which] made it very unlikely that very many patients would stray. They came to a place, not to a man." We think the record amply demonstrates that a substantial amount of goodwill existed in connection with the practice carried on at the North Hollywood office.

As it appears from our discussion in *Malcolm J. Watson, supra*, even though goodwill in the broad sense exists, to be considered a property interest subject to capital gains treatment it must be transferable, i.e., it cannot be of a sort which is dependent solely upon the personal qualifications of the owner. The record makes it clear that the success of the practice which Bloch purchased was not dependent on personal qualifications possessed by Brooks. Several things lead to this conclusion. The clinic fashion in which the practice was conducted at all three locations completely removed the personal relationship between Brooks and the clinic patients. The success of the business apparently lay in supplying satisfactory assembly line orthodontic work at lower prices which resulted from the high volume of patients which could be handled. No personal professional qualifications of Brooks entered into the success of the practice at all. He saw only a small proportion of the patients. He divided his working time between the three locations, usually spending no more than 1 day a week at the North Hollywood office. Yet as the schedules of income from all three offices show, all were profitable. Bloch testified that after he purchased the North Hollywood practice it continued to remain a highly profitable operation, even though Brooks retained substantially no connection with it. There were no elements such as "Ability, skill, experience, acquaintanceship, or other personal characteristics" [6] which were transferred to Bloch which enabled him to produce income from the practice. We conclude that the goodwill of the North Hollywood practice was vendable.

After having determined that goodwill existed in the business and that it was by its nature salable, it follows that under the facts of this case it was purchased by Bloch because he bought everything there was to buy.

Respondent argues that even if we determine that there was some element of goodwill represented by the payments to Brooks, still the

[6] *Providence Mill Supply Co.*, 2 B.T.A. 791, 793.

major portion of the total payments made each year constitute ordinary income because derived from the covenant not to compete. The record gives no support to this argument.

The existence of a covenant not to compete in a contract does not necessarily mean that some part of the consideration was paid for it. *Aaron Michaels*, 12 T.C. 17. Rather, it is necessary to look at the entire transaction to see what the parties bargained for. Here, they bargained for the tangible equipment of the office and the intangible going practice. The sales agreement specifically states that goodwill is to be sold. Cf. *Nelson Weaver Realty Co.*, 35 T.C. 937. Both Brooks and Bloch testified that the clause not to compete was an afterthought which did not originate with either one of them but which was added at the last minute by Brooks' attorney. The price of $240,000 was arrived at before the parties thought of a covenant not to compete. In addition, it was Brooks' representative who suggested the clause. Coming as it did after the price had been fixed it can hardly be taken as being a part of the bargained-for consideration. We think the record supports the conclusion that the covenant not to compete was ancillary to the transfer of goodwill and if it had significance at all it only had "the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired." *Aaron Michaels, supra* at 19.

We hold that the amounts of $5,749.80 and $11,499.60 received by petitioner in 1955 and 1956, respectively, were proceeds from the sale of goodwill and as such were correctly reported on Brooks' income tax returns for those years as capital gains income. We note that this same conclusion was reached in *Rees* v. *United States*, 187 F. Supp. 924 (D. Ore. 1960), a case dealing with the sale of goodwill by a dentist specializing in orthodontics. Because of other adjustments not in controversy, a Rule 50 computation will be necessary.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

PIERCE, *J.*, dissents.

---

OPPER, *J.*, concurring: The vendor's covenant was not only the "negative" agreement not to compete but also included "affirmative personal services," see *Richard Ullman*, 29 T.C. 129, 139 (1957), affd. 264 F. 2d 305 (C.A. 2, 1959), consisting in this case of a commitment "that Seller shall continue to refer to Buyer those patients from Seller's other dental offices who reside within the aforesaid five mile radius." It is my understanding that this issue has not been suggested by respondent nor argued by the parties, and it may of course be that no value is attributable to it. Such an agreement, however, could, in my opinion, generate ordinary income to the vendor to the extent of the consideration paid for it, even though it might correspondingly be de-

**1136**

ductible by the buyer. *Black River Sand Corporation*, 18 B.T.A. 490, 498 (1929). Because the issue apparently was not raised, I concur in the result.