KEITH MISEGADES AND ALICE MISEGADES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 938–68.   Filed December 24, 1969.

Keith Misegades, pro se.
*Charles L. Dunlap*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the calendar years 1964 and 1965 in the amounts of $1,330.46 and $1,068.80, respectively.

The issue for decision is whether petitioners are entitled to deduct in each of the years herein issue $4,500 as depreciation or amortization of an amount paid by one of the petitioners to the estate of the lawyer with whom he had been previously associated pursuant to an agreement between petitioner and the executor of the deceased lawyer's estate.

478

Some of the facts have been stipulated and are found accordingly.

Keith and Alice Misegades, husband and wife who resided in Bethesda, Md., at the time of the filing of the petition in this case, filed Federal joint income tax returns for the calendar years 1964 and 1965 with the district director of internal revenue at Baltimore, Md.

Keith Misegades (hereinafter referred to as petitioner) is a patent lawyer. Immediately after his graduation from college in 1929 he became a patent examiner in the U.S. Patent Office, specializing in chemical engineering. While so employed he attended law school and received his law degree in 1932. Thereafter, he was employed by several corporations as a patent attorney and also engaged in private practice as a patent attorney.

In 1954 he became associated as an employee with Raymond A. Walsh, a patent lawyer who was practicing under the name of Parker and Walsh. Parker and Walsh is the successor of a patent firm originally opened in 1903 under the name of C. L. Parker. In 1926 the son of C. L. Parker joined the firm and the son continued to practice after the death of his father in 1928. In 1948 Raymond A. Walsh became a partner and the firm name was changed to Parker and Walsh. C. L. Parker, Jr., died in 1950 and thereafter Raymond A. Walsh carried on the practice alone but retained the firm name of Parker and Walsh.

Raymond A. Walsh was about 2 years younger than petitioner and at the time petitioner became associated with him was in good physical health. At the time petitioner was employed by Parker and Walsh he had no expectation of taking over the practice of that firm. However, on January 22, 1963, Raymond A. Walsh was killed in an air crash accident. At that time petitioner was 55 years old and not in extremely good health.

A substantial part of the business of Parker and Walsh came from a small number of corporate clients who were not large enough to have house patent counsel and yet had a substantial amount of patent work. In addition, general attorneys throughout the country located in small towns where there was no patent attorney practicing would forward patent work to Park and Walsh. The major portion of the work of Parker and Walsh is in advice to clients and prosecution of cases before the Patent Office. The firm did engage in some patent litigation work. Raymond A. Walsh handled most of the firm's contacts with clients and after petitioner became associated with Parker and Walsh he handled both patent applications and trademark work and was responsible primarily for interviews with examiners in the Patent Office and the writing of briefs and attending of hearings on appeals cases.

After the death of Raymond A. Walsh petitioner made some inquiry of other patent lawyers and was informed that some of them had purchased practices of lawyers who had either died or retired. Petitioner was informed that the usual amount paid for such a practice was one-third of the gross returns of the business for the 3 years following the transfer of the practice.

At the time of the death of Raymond A. Walsh, the firm of Parker and Walsh had pending before the Patent Office about 200 applications in various stages of prosecution. Petitioner as an employee of Parker and Walsh, had been prosecuting these patent applications before the Patent Office for the firm. In order to continue the prosecution of these cases, assuming that the client upon being informed of the death of Raymond A. Walsh was satisfied to have petitioner so continue, it was necessary that petitioner either have the files with respect to these applications which were in the offices of Parker and Walsh or purchase copies of those files from the Patent Office at an estimated cost of $20 per file.

Petitioner began to negotiate with Rosalie C. Walsh, who was the executrix of the Estate of Raymond A. Walsh, with respect to the purchase of the practice of Parker and Walsh. Offers other than that made by petitioner were made to the executrix. Petitioner discussed with the executrix the possibility of paying her one-tenth of the adjusted gross income from his practice of patent law for a period of 15 years. The normal estimated gross income of the business was considered to amount to approximately $45,000 per year, although in some years the amount of gross income of Parker and Walsh had exceeded that amount. The executrix was concerned as to whether petitioner's health would permit him to continue in practice for 15 years and various alternatives were discussed. Finally, it was agreed that petitioner would pay $45,000 upon execution of the agreement with the executrix and make further payments in any year in which the gross receipts of the business exceeded $45,000.

On July 31, 1963, petitioner and Rosalie C. Walsh, executrix of the Estate of Raymond A. Walsh, entered into a written agreement. This agreement recited the fact that Rosalie C. Walsh, in the interest of her late husband's memory and in the interest of the clients of Parker and Walsh, was desirous of having her late husband's patent practice continued on the same high professional level and ethical standards as it had been during the lifetime of her husband; that petitioner had been continuing the conduct of the affairs of Parker and Walsh under retainer from the Walsh estate in order to protect the estate and the clients of Parker and Walsh until some arrangement could be made for disposition of the practice; that the parties had concluded that

petitioner was the logical and proper person to carry on the patent practice which had been conducted by Parker and Walsh to the extent the clients thereof were satisfied to select him to continue their work; and that therefore the parties were entering into this agreement. There were 16 separate paragraphs of the agreement. Paragraphs 1 and 2 dealt with the preparation of a financial statement and the disposition of accounts receivable of the firm as of July 31, 1963. Paragraphs 3, 4, and 5 provided as follows:

3. That any and all furniture, fixtures, mechanical equipment, books, magazines, pamphlets, office supplies and materials and all other tangible personal property of "Parker & Walsh" shall be appraised by the official appraiser for the Orphans' Court for Montgomery County, Maryland, and Keith Misegades shall pay in cash to the Estate of Raymond A. Walsh promptly upon demand, the greater of (a) the full amount of such appraised value or (b) the taxable value of such tangible personal property as set forth upon the District of Columbia personal property tax return of "Parker & Walsh" as filed during July, 1963, for the fiscal year 1964, but in no event more than Three Thousand Dollars ($3,000.00) ; and that Rosalie C. Walsh, as Executrix of the Estate of Raymond A. Walsh, shall execute in favor of Keith Misegades such bill of sale or other papers, if any, as he may deem necessary to transfer title or provide evidence of transfer of title to him of such tangible personal property, such bill of sale or other papers to be prepared by Keith Misegades.

4. That, in recognition of past cordial relationships and courtesies extended by Raymond A. Walsh during their association, and a fair evaluation of the intangible assets, good will and potential of the patent practice of "Parker & Walsh", Keith Misegades agrees to pay to the Estate of Raymond A. Walsh the sum of Forty-five Thousand Dollars ($45,000.00), by certified check or Treasurer's check drawn on a Washington, D.C. bank, to be delivered concurrently with the execution of this Agreement.

5. That in addition to the Forty-five Thousand Dollars ($45,000.00) cash payment specified in Paragraph 5 (sic), just above, Keith Misegades agrees to take the following action with respect to possible further additional payments to the Estate of Raymond A. Walsh:

(a) During the period January–March 1964, Keith Misegades shall cause Julius Sinker, CPA, (or such other certified public accountant as may be agreed upon from time to time between the parties) to make an audit of the books of the Misegades patent practice, including his practice as successor to the "Parker & Walsh" firm, and determine the amount of adjusted gross client billings for the period from August 1, 1963, through December 31, 1963. For such purposes (and all other purposes of this Paragraph 5(a)(b)(c)(d) "adjusted gross client billings" shall mean total gross billings to clients collected during the calendar year involved, less, to the extent included in such gross billings, reimbursement of client expenses.

(b) During the period January–March of 1965 and of each succeeding year through 1978 (a period of fifteen (15) years being contemplated) Keith Misegades shall cause a similar audit to be made and the amount of the collected adjusted gross client billings determined for the preceding calendar year in each case.

(c) Before April 1st of each year 1964 through 1979 Keith Misegades shall compute in dollars ten percent (10%) of the adjusted gross billings so determined

in each case and shall, again before said April 1st deadline, pay to Estate of Raymond A. Walsh the amount by which such ten percent (10%) of adjusted gross billings shall exceed the sum of Forty-five Hundred Dollars ($4,500.00), *provided* that for purposes of this Agreement the ceiling for annual adjusted gross billings shall never exceed Ninety Thousand Dollars ($90,000.00); *provided further* that the April 1, 1964, payment shall be limited to the amount by which ten percent (10%) of the adjusted gross billings shall exceed One Thousand Eight Hundred Seventy-Five Dollars ($1,875.00); *and provided further* that the April 1, 1979 payment shall be calculated upon adjusted gross billings for the first seven months of the year 1978, but shall be limited to the amount by which ten percent (10%) of the said adjusted gross billings shall exceed Two Thousand Six Hundred Twenty-Five Dollars ($2,625.00).

(d) As soon as the figures are available for the year 1968, the Royal Crown Cola Co. account will be reviewed for the years 1964–68 inclusive. If the adjusted gross billings for this account for such five-year period have equalled or exceeded "Parker & Walsh" billings for this account for the five year period 1958–62, then the agreed-upon maximum annual payment under (c) above shall remain the same for the balance of the term of this Agreement. If the adjusted gross billings for this account for such five-year period have been half or less than half the "Parker & Walsh" billings for this account for the five-year period 1958–62 then the agreed-upon maximum annual payment for the balance of the term of this Agreement shall be $8,000.00. If the adjusted gross billings fall between half and the whole of said 1958–62 billings, then the maximum annual payment shall be $8,000.00, plus the ratio of the 1964–68 billings to the 1958–62 billings times $1,000.00.

Paragraph 6 of the agreement provided for the place of making payments. Paragraphs 7 and 8 provided as follows:

7. That insofar as she may have any interest therein to convey or any right therein to grant, Rosalie C. Walsh, Executrix of the Estate of Raymond A. Walsh agrees Keith Misegades shall be entitled to the use of the firm name, "Parker & Walsh", and to hold himself out as a former associate of and successor to Raymond A. Walsh, in the future conduct of the patent practice, but only to the extent that such use and holding-out shall be clearly permissible within the ethical standards of the U.S. Patent Office, the American Patent Law Association, the District of Columbia Bar Association and the American Bar Association.

8. That commencing August 1, 1963, Keith Misegades shall take over occupancy of the "Parker & Walsh" office suite at 804 Washington Building, Washington, D.C., and shall thereafter assume and pay all rental therefor. It is further understood and agreed that as of August 1, 1963, Keith Misegades will also assume, and undertake the full obligation of, all outstanding contracts and commitments which may have been made by Raymond A. Walsh in his own name or the name of "Parker & Walsh" in connection with the operation of "Parker & Walsh", but he may in his discretion thereafter cancel any such contracts and commitments as may be cancellable. However, Keith Misegades will not be obligated to fulfill any non-cancellable contracts from which he may not be reasonably expected to receive some benefit in his practice.

Paragraph 9 provided that petitioner would seek to secure a partner or an associate who was a member of the bar and had experience in practicing before the U.S. Patent Office and who was willing to execute

an addendum to the agreement providing for his assumption with petitioner and severally as well, of petitioner's obligation as to payment to Rosalie C. Walsh of a percentage of gross billings under paragraph 5(a), (b), and (c) of the agreement. This paragraph further provided that the selection of such partner or associate should be subject to the approval of Rosalie Walsh but that her approval was not to be unreasonably withheld.

Paragraph 10 of the agreement provided that petitioner would retain the secretary and bookkeeper and patent searcher then employed by the firm in his employ so long as those parties wished to continue in such employment and petitioner found the continuation of such employment consistent with the sound operation of his office. Paragraphs 11 and 12 provided as follows:

11. That Keith Misegades will undertake in every way possible to make certain that he and his partner or associate (or partners and associates from time to time, as the case may be) continue the conduct of the patent practice on the same high level, consistent always with the finest professional standards and highest ethical principles, as has been true of the conduct of the practice of "Parker & Walsh" by the late Raymond A. Walsh and Keith Misegades.

12. That in consideration of the promises hereinbefore enumerated, such right, title and interest as may have been held by the Estate of Raymond A. Walsh, deceased, in the patent law offices of "Parker & Walsh" and the appurtenances thereto are hereby, and henceforth shall be, vested solely in the person of Keith Misegades, and all of the obligations, liabilities and responsibilities of said offices are hereby, and henceforth shall be fully assumed by said Keith Misegades. And that Rosalie C. Walsh, Executrix of the Estate of Raymond A. Walsh, will at the expense of the Estate advise clients and correspondents of "Parker & Walsh" of the change in such responsibilities, will extend her fullest cooperation, consistent with the highest ethical standards, in assisting Keith Misegades in retaining the clients, and will not do anything which may in any way adversely affect his retention of any client during the life of this Agreement.

Paragraph 13 provided for a division of fees between petitioner and the Walsh Estate with respect to two cases which were currently pending in the office of Parker and Walsh on a contingency fee basis.

Paragraph 14 provided that no waiver or any breach of any portion of the agreement should operate as a waiver of the agreement itself or any subsequent breach thereof.

Paragraph 15 provided as follows:

15. That this instrument, when executed, shall serve as and constitute the entire agreement between the parties hereto and neither party shall be bound by any oral statements or representations, by way of inducement or otherwise, not herein contained.

The final paragraph, No. 16, provided that each party should keep and perform the agreement and that the agreement should be binding upon them, their heirs, executors, administrators, successors, and/or assigns.

On August 29, 1963, each of the clients of Parker and Walsh was sent a letter signed by Rosalie C. Walsh, Executrix of the Estate of Raymond A. Walsh. The letter was on stationery which was entitled, "Law offices Parker and Walsh." The body of this letter was as follows:

It is my sad duty as Executrix of the Estate of Raymond A. Walsh, to inform you of his death on June 22, 1963.

As you undoubtedly know, Mr. Walsh's death terminated the Power of Attorney which you had executed in his favor so that there is presently no one authorized to represent you, or take any action, in your cases pending before the United States Patent Office. It is, therefore, very much in your interest to promptly appoint an attorney of your choice to represent you in these matters in order that all necessary steps may be timely taken on your behalf.

In the interim between Mr. Walsh's death and the present date, Mr. Keith Misegades, a qualified patent and trademark lawyer and Mr. Walsh's associate in Parker and Walsh for many years, has been retained by the estate to make certain that all cases in the office are current and that no loss or damage to rights in patent and trademark cases has occurred or is in prospect. However, now that Mr. Misegades has completed this survey and determined that the present status of all cases is satisfactory, the estate is seeking immediate instructions from each Parker and Walsh client as to the disposition to be made of his files.

As of August 1, 1963, Mr. Walsh's estate gave up the Parker and Walsh suite at 804 Washington Building, Washington, D.C. and the space has been leased to Mr. Misegades for use in his patent and trademark practice.

Under the foregoing circumstances the estate will appreciate prompt instructions from you as to what is to be done with your files and cases—whether they are to be turned over to Mr. Misegades, or to some other patent lawyer of your selection. Needless to say, it will be necessary for the estate to seek reimbursement from you of packaging and mailing or delivery charges, should any such expenses be incurred. It is requested that you acknowledge receipt of this notice and mark your file delivery instructions in the spaces indicated on the enclosed letter. A self-addressed and stamped envelope is enclosed, herewith, for your convenience in this connection.

Petitioner was consulted by Rosalie C. Walsh in the preparation of this letter and read the final proposed draft of the letter before it was sent to the clients. Many of the clients of Parker and Walsh continued to have petitioner represent them but some of them did not. Some of the files of Parker and Walsh with corporate clients go back to the early 1900's. In representing a corporation as its patent attorney on a continuing basis it is necessary almost every week to consult the files with respect to such corporate client to properly render adequate legal advice as to its patents. These files also contain notations of matters which will require legal attention in the future, which it is incumbent upon a person possessing such file to call to the attention of the client. With respect to trademarks which have to be renewed periodically, it is necessary to have a followup system in the file to call the attention of the client to the need for such renewal. After a trademark has been on the register for 5 years it is necessary for an affidavit of continuing use

to be filed and the files in the office of Parker and Walsh contained, with respect to trademarks they had registered for a client, a card indicating when such an affidavit was due, in addition to the card in the file with respect to the date when renewal applications were due.

Petitioner retained the files of most of the clients of Parker and Walsh since most of the clients chose to have him represent them as their patent attorney. However, there were a number of files of various clients that were turned over to such clients at their request. Since petitioner took over the practice formerly conducted by Parker and Walsh his gross receipts have not been in excess of $45,000.

Petitioners on their Federal income tax returns for each of the calendar years 1964 and 1965 claimed a deduction in the amount of $4,500 with the explanation, "Write off a portion of the cost of purchasing business."

Respondent in his notice of deficiency disallowed the claimed deductions with the following explanation:

It is determined that $45,000.00 was paid to acquire the patent law practice known as "Parker and Walsh", all of which amount represented the price paid for goodwill or other intangibles having an indeterminate useful life. Therefore, the deduction of $4,500.00 claimed as depreciation or amortization with respect to such acquisition cost is unallowable, and your taxable income in increased in the amount of $4,500.00.

### OPINION

Section 167, I.R.C. 1954, and section 1.167(a)–3, Income Tax Regs.,[1] provide for deductions for depreciation or amortization with respect to intangible assets. When an intangible asset used in a trade or business or for the production of income by a taxpayer has a limited useful life, the length of which can be estimated with reasonable accuracy, depreciation or amortization is allowable based on the estimated useful life of the asset. However, if such an intangible asset has an indefinite or unlimited useful life, no deduction for depreciation or amortization is allowable with respect thereto. See *Manhattan Co. of Virginia, Inc.,*

---

[1] SEC. 167. DEPRECIATION

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

Income Tax Regs., sec. 1.167(a)–3  Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. * * *

50 T.C. 78 (1968). Respondent's regulations specifically provide that no deduction for depreciation is allowable with respect to goodwill. The rationale underlying this provision of respondent's regulations is that goodwill is an asset with a useful life which is not ascertainable. It has been held in a number of cases that assets in the nature of goodwill which, similar to goodwill, have an indefinite useful life, are not subject to depreciation. See *Commissioner* v. *Seaboard Finance Co.*, 367 F. 2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court.

In the instant case petitioner takes the position that even though the agreement which he entered into with the executrix of the Walsh Estate refers to goodwill, he was in fact buying the files which Parker and Walsh maintained with respect to various clients. It is respondent's position that the agreement between petitioner and the executrix of the Walsh Estate clearly states that petitioner was purchasing goodwill. Petitioner answers this argument by stating that even though the agreement refers to the purchase of "goodwill" a lawyer is not in a position to transfer goodwill and therefore he could not be purchasing goodwill.

The evidence in this case shows that the files which petitioner claimed were the important aspect of his purchase actually belonged to the various clients and those clients had the right to, and some of them did, have the files transferred to another patent attorney or returned to them after the death of Raymond A. Walsh. It is therefore clear that petitioner did not purchase for the $45,000 which he paid to the executrix of the Walsh Estate, the files as a tangible asset. Whatever rights he purchased with respect to the files were intangible rights of use. We must therefore determine whether the intangible rights which petitioner purchased had an ascertainable useful life so as to be subject to depreciation.

We have held on numerous occasions that there is a salable goodwill attached to a professional practice. See *Hoyt Butler*, 46 T.C. 280 (1966), so holding with respect to an accountant; *Merle P. Brooks*, 36 T.C. 1128 (1961), so holding with respect to a dentist engaged in the practice of clinical orthodontia; and *Alfred Meurlin*, 25 T.C. 118 (1955), holding that there was a transfer of goodwill upon the purchase by a doctor of a deceased doctor's medical practice.

Even if petitioner's primary interest was in retaining use of the files with respect to clients which had been maintained by Parker and Walsh, such right to use, combined with a suggestion by the executrix of the Walsh Estate that the clients might find petitioner's continued services to them satisfactory, was an asset in the nature of goodwill. We conclude that the $45,000 paid by petitioner in 1963 for the purchase of the patent law business of Parker and Walsh was

paid for an intangible asset in the nature of goodwill which had no ascertainable useful life.

Petitioner is apparently making some argument that since he was 55 years old, we should use a 15-year useful life for the intangible asset if we consider his purchase from the executrix of the Walsh Estate to be of intangible asset in the nature of goodwill. In support of his position he argues that the normal retirement age for a lawyer is 70, and that therefore he will be unable to continue to practice after 15 years. In support of this argument petitioner cites *Glenn L. Heigerick*, 45 T.C. 475 (1966); *Walters* v. *Commissioner*, 383 F. 2d 922 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court; and *Wells-Lee* v. *Commissioner*, 360 F. 2d 665 (C.A. 8, 1966), reversing on this issue a Memorandum Opinion of this Court. The first two of these cases held amounts expended by doctors to obtain staff privileges in a hospital to be capital expenditures not deductible in full as ordinary and necessary business expenses in the year paid. Respondent in these cases had allowed amortization of the amount over the life expectancy of the doctor. The case of *Wells-Lee* v. *Commissioner, supra,* held that a payment made by a doctor to practice in a hospital was depreciable or amortizable over the expected life of the hospital when such expected life was shorter than the purchasing doctor's life expectancy, even though respondent contended that such payments should be amortizable over the life expectancy of the doctor. The facts in all three of those cases show that the payment by the doctor was for a personal privilege which ceased with that doctor's retirement or death.

There is no evidence in the instant case of how long petitioner may actually continue in the patent law practice even though at the date of the purchase from the Walsh Estate he was 55 years old. However, if the asset purchased by petitioner were a wasting asset over petitioner's professional life, we might make some reasonable estimate of petitioner's life expectancy and permit him to amortize the $45,000 payment he made in 1963 over the period of his life expectancy. However, the record is clear that it was customary for retiring patent attorneys and the estates of deceased patent attorneys to sell a patent law practice. Insofar as this record shows, at whatever time petitioner retired, or should he continue in practice until his death, at the time of his death the intangible asset composed of the patent law practice which he purchased might have a value equal to or in excess of the amount petitioner paid for the asset. Therefore, there is nothing in this record to indicate that an amortization or depreciation deduction should be allowed with respect to the $45,000 over petitioner's life expectancy. The fact that the asset acquired by petitioner was not merely a personal privilege which would cease at his retirement or

death distinguishes this case from *Glenn L. Heigerick, supra; Walters v. Commissioner, supra;* and *Wells-Lee* v. *Commissioner, supra.*

Petitioner contends that even if we determine that the asset which he purchased had no ascertainable useful life, we should nevertheless allow the claimed deductions since the reality of the situation here was a payment of 10 percent of the gross receipts of his patent law business over a 15-year period. The short answer to this is that the facts do not support petitioner's contention. The facts here show that irrespective of how the purchase price of $45,000 might have been arrived at between the parties, petitioner made a lump-sum payment of $45,000 for the practice he purchased and agreed in addition to pay 10 percent of the amount by which his gross receipts in any year exceeded $45,000 for a period of 15 years. No payments were made in the years here in issue under the provision for payments of 10 percent of gross receipts in excess of $45,000. It is therefore unnecessary for us to decide whether or not payments on the basis of a yearly percentage of gross receipts for a stated number of years would be deductible since no such payments were made in the years here in issue.

*Decision will be entered for respondent.*