DON AND RITA CHARLESTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DON CHARLESTON & CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Charleston v. Commissioner
Docket Nos. 14999-84, 15000-84.
United States Tax Court
T.C. Memo 1986-372; 1986 Tax Ct. Memo LEXIS 245; 52 T.C.M. (CCH) 174; T.C.M. (RIA) 86372; August 11, 1986. Mark Charleston, for the petitioners. Evelyn M. Zeller, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioners' taxable years 1979, 1980 and 1981. These consolidated cases concern petitioners Don and Rita Charleston and an incorporated accounting practice known as Don Charleston & Co. In separate statutory notices of deficiency dated March 5, 1984, respondent determined income tax deficiencies for the 3 taxable years, as follows: 1979
1980
1981
Don and Rita Charleston
$2,097
$1,147
$1,694
Don Charleston & Co.
$1,541
$1,564
$1,388
The deficiencies are attributable solely to the disallowance of claimed amortization *246 of a customer list by the corporate taxpayer and the inclusion of constructive dividends to the individuals in connection with payments made to Don Charleston's parents for acquisition of his accounting practice. The issues presented for our consideration are: (1) Whether petitioner acquired the customer list of an accounting business or whether a going concern, including goodwill, was acquired; (2) if all or part of the acquisition constitutes a customer list, whether that list had an indefinite useful life so that its cost was not depreciable; and (3) whether payments made by the corporate petitioner to the individual petitioner's parents for the purchase of an accounting practice constitute constructive dividends. FINDINGS OF FACT Petitioners Don and Rita Charleston resided in Melrose Park, Pennsylvania, at the time of filing their petition in this case. Petitioner Rita Charleston is a party to this proceeding only by reason of filing joint Federal income tax returns with Don Charleston for the taxable years 1979 through 1981. Petitioner Don Charleston & Co. (Corporation) had its principal place of business in Melrose Park, Pennsylvania, at the time it filed its petition *247 herein. Petitioner Don Charleston (Don) is a certified public accountant and began his accounting career in 1955 working for his father. Don's father, Abe Charleston (Abe), operated an individual proprietorship which conducted a bookkeeping and tax service under the name of Charleston Audit and Tax Service up until 1964. Abe was not a certified public accountant. Essentially, Abe maintained books and performed "write up" work in single-entry form for small individual proprietors. Additionally, Abe assisted his clientele in the preparation of their tax returns. Abe did not keep any general ledgers or prepare financial statements for his customers. Abe singularly conducted a bookkeeping and tax service until 1955 when his son, Don, joined him as an employee. Don worked for his father for 9 years until his father's retirement in mid-1964. During that period, Don became familiar with his father's practice and was known to the clients. In 1964, at a time when Abe's business had 119 customers, Don entered into an oral understanding with his father. Although some memorandum of the understanding had been prepared, petitioners were unable to produce the memorandum. Don was to pay *248 $100 a week for the remainder of Abe's life. If the net profit of the accounting practice exceeded $30,000 for 2 consecutive years, Don was to pay an additional $100 a week to his father. When Abe died, if Don's mother was still alive, she was to receive a maximum of $100 per week. In exchange for those payments, Don became entitled to the bookkeeping and tax service practice. The gross income of the business for 1964 was $47,200 and the net income was approximately $17,000. Pursuant to the understanding, Don paid his father $100 a week beginning in 1964 through the end of 1972. Beginning in 1973, Corporation paid Abe $200 a week through July of 1978 when Abe died. Thereafter, Corporation paid Don's mother $100 a week until she died on September 6, 1981. Don and Corporation paid Don's parents a total of $118,500 during the period beginning mid-1964 through September of 1981. During 1964 when Abe retired, Don acquired all of the files, records, office furnishings, office equipment and the lease to the business premises. Don continued the business as a sole proprietor supplying bookkeeping, accounting and tax services to the existing clients beginning in mid-1964. Don no *249 longer used the business name of Charleston Audit and Tax Service and began using the name Don Charleston, C.P.A., instead. In 1972, Don incorporated his sole proprietorship and began using Don Charleston & Co. as the corporate business name. Upon the retirement of Abe, Don continued to employ the same secretaries and did not notify the clients of the change in ownership. Although Don and Abe had negotiated concerning Don's takeover of the accounting service, no allocation of value had been made among the assets Don acquired from his father. At the time of Don's takeover, his father was 63 years old and his mother was 62 years old. [1] Don believed that their life expectancy was no more than 8 to 10 years because they suffered from coronary arteries disease and because of their family medical histories. Accordingly, Don expected to pay approximately $52,000 ($5,200 per year for 10 years) for the accounting practice. Don did not claim any amortization with respect to the 1964 *250 client list that he acquired from the period beginning 1964 through 1976. In 1977, for the first time, Don Charleston & Co. claimed amortization of the client list which had been acquired in 1964. The amortization deduction claimed for 1977 was $9,640 which was computed by applying a 10-percent rate to the cumulative total of payments which had been made to Abe from 1964 through 1977 ($96,400). Similarly for taxable years 1979, 1980 and 1981, the Corporation claimed amortization in the amount of 10 percent of the adjusted total of the payments made to Don's parents. The adjusted total was computed by adding all payments made up to the point of the claimed amortization and deducting the accumulated amortization from prior years. The amounts so claimed for the years in issue are: $9,066 for 1979, $8,680 for 1980 and $8,162 for 1981. The Corporation's returns reflect in Schedule L (the balance sheet), under other assets, an amount each year for the "cost of purchased accounts." No amount is reflected in the corporate tax return balance sheets regarding a liability for payments to Don's parents pursuant to the 1964 understanding. Up until 1977, Don and the Corporation had lost *251 less than 5 of the original 119 customers acquired in 1964. Don testified, in an effort to explain why amortization had not begun until 1977, that the customer loss experience increased to 10 or 11 during 1977. The fair market value of a small professional business during 1964 could be expected to be in a range of 1 to 1.5 times the gross revenues of the business. Considering $100 level weekly payments for 17.8 years (the longest of the two life expectancies), the overall payments for the accounting business would have totaled $92,900. The discounted present value would have been rounded to approximately $56,000. A $56,000 present interest during 1964 would have approximated 1.2 times the business' gross revenues for that year ($47,200). OPINION Section 167(a)[2] provides for an amortization or depreciation deduction on property used in business or held for the production of income. Section 1.167(a)-3, Income Tax Regs., is a long-standing [3] refinement of the general rule as it applies to "intangibles." In pertinent part, section 1.167(a)-3, Income Tax Regs. *252 , provides as follows: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to the goodwill. * * * The controversy of the parties centers on whether a customer list was purchased or whether, as *253 respondent contends, a going concern, including goodwill, was acquired. If we decide this question in petitioners' favor, then petitioners have the burden of showing that the intangible asset has a limited useful life of ascertainable duration. Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1246 (5th Cir. 1973); Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78, 87-88 (1968); Misegades v. Commissioner,53 T.C. 477, 484-485 (1969). If any portion of the acquisition is attributable to goodwill, that part is not amortizable. Sec. 1.167(a)-3, Income Tax Regs.; Houston Chronicle Publishing Co. v. United States,supra at 1247. The general rule is that acquisition of a professional practice is the acquisition of an intangible capital asset in the nature of goodwill. Misegades v. Commissioner,supra at 485 (a lawyer), Boe v. Commissioner,35 T.C. 720, 724-725 (1961), affd. 307 F.2d 339 (9th Cir. 1962) (a doctor); *254 Butler v. Commissioner,46 T.C. 280 (1966) (an accountant); Brooks v. Commissioner,36 T.C. 1128 (1961) (a dentist). "Goodwill," in the context of intangible assets (subscription lists), similar to those in this case, was effectively expounded upon in Houston Chronicle Publishing Co. v. United States,supra at 1247, as follows: "[T]he nature of goodwill * * * is the expectancy that 'the old customers will resort to the old place.' Commissioner of Internal Revenue v. Killian, 314 F.2d 852, 855 (C.A.5, 1963); Nelson Weaver Realty Co. v. Commissioner of Internal Revenue, 307 F.2d 897, 901 (C.A.5, 1962); Karan v. Commissioner of Internal Revenue, 319 F.2d 303, 306 (C.A.7, 1963). '[T]he essence of goodwill is the expectancy of continued patronage, for whatever reason.' Boe v. Commissioner of Internal Revenue, 307 F.2d 339, 343 (C.A.9, 1962) * * *. [T]o the extent [a given item or asset] contributes to the expectancy that the old customers will resort to the old place it is an element of goodwill. Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 651 n. 6 *255 (C.A.9, 1966); Boe v. Commissioner of Internal Revenue, supra,307 F.2d at 343. "* * * "This Court has held that * * * goodwill is acquired by the purchaser of a going concern where the 'transfer enables the purchaser to step into the shoes of the seller.' Balthrope v. Commissioner of Internal Revenue, 356 F.2d 28, 32 n. 1 ([C.A.5] 1966); Masquelette's Estate v. Commissioner of Internal Revenue, 239 F.2d 322, 325 ([C.A.5] 1956). We have also said that goodwill is transferred where, as here, the buyer continues the seller's business uninterrupted, using primarily the seller's employees, and utilizing the seller's name. Barran v. Commissioner of Internal Revenue, supra, 334 F.2d 58, 61 ([C.A.5] 1964). It is immaterial that the agreement did not use the term 'goodwill,' for '[t]he use of these words is, of course, not necessary if in fact what is transferred does give to the purchaser everything that can effectively aid him to step into the shoes of the seller.' Masquelette's Estate v. Commissioner of Internal Revenue, supra, at 325; see also Barron v. Commissioner of Internal Revenue, *256 supra, at 61 * * *." Don testified and now argues in his brief that his only intent was to buy the customer list and that, accordingly, the entire purchase price should be allocated to that asset. The record in this case simply does not support petitioners' contentions. We must agree with respondent that Don purchased a professional practice from his father. A number of factors have led us to this ultimate finding of fact. Don did not separate the customer list and utilize it in another business, as was done in Manhattan Co. of Virginia, Inc. v. Commissioner,supra;National Service Industries, Inc. v. United States,379 F. Supp. 831 (N.D. Ga. 1973); or Holden Fuel Oil Co. v. Commissioner,T.C. Memo. 1972-45. Here, Don merely stepped into his father's practice. The same office, secretaries, office equipment, fixtures and customer records were utilized by Don. No announcement concerning the new ownership was made to the 119 customers. Ostensibly, such an announcement might have affected the clients' continued patronage. The transition in this setting was nominal because Don had worked in his father's business for 9 *257 years before the acquisition and had developed a working rapport with clients. This is evidenced by their continued patronage reflected in the nominal reduction of the 119 customers for the 14 years preceding the first taxable year in issue. We find it incredible that Don would need to purchase a customer list composed of the very individuals and businesses he had helped to service for 9 years. We find this case no different from Misegades v. Commissioner,supra, and others where there is an acquisition of a professional practice which constitutes an intangible asset in the nature of goodwill. The customer list in this case is so inextricably linked with goodwill that it cannot be considered separately from the goodwill of the accounting or bookkeeping practice acquired. Marsh & McLennan, Inc. v. Commissioner,51 T.C. 56, 64 (1968), affd. 420 F.2d 667, 668 (3d Cir. 1969). Accordingly, Corporation is not entitled to a deduction for amortization of the customer list for the taxable years 1979, 1980 and 1981. Having found that Don acquired *258 a non-dep reciable or non-amortizable intangible asset, there is no need to consider or decide whether petitioners have carried their burden of showing that the "customer list" had a limited useful life of ascertainable duration; [4] the depreciable basis of the asset; or whether the respondent's regulation concerning depreciation that is "allowed or allowable" is valid or "unconstitutional," as petitioners contend. The remaining issue for our consideration is whether the $100 weekly payments made by Corporation to Don's mother are taxable to Don as constructive dividends. The existence of a constructive dividend is conceptually gauged by whether "the corporation conferred an economic benefit on the stockholder without the expectation of repayment." Gibbs v. Tomlinson,362 F.2d 394, 397 (5th Cir. 1966); Sullivan v. United States,363 F.2d 724, 728 (8th Cir. 1966); *259 Hash v. Commissioner,273 F.2d 248, 250 (4th Cir. 1959). The parties have provided us with a very limited briefing of this point with respect to the facts and law. Respondent has cited two "boilerplate" constructive dividend cases and supplied the proposed finding of fact that Corporation's return does not reflect assumption of the liability to Don's parents. Petitioners simply contended that whether we find that goodwill, a going business or a customer list was acquired, the purchase of a business asset was being completed by the $100 weekley payments made during the taxable years before us. To this extent petitioners are correct and respondent has not contended or denied that there was not an arm's-length purchase by Don from Abe. The crucial question we must determine is whether the payments were for Don's benefit. Essentially, if a corporate entity makes a payment for a shareholder's personal benefit, a constructive dividend may have occurred. There are numerous cases where payments were made on personal obligations of shareholders. E.g., see Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962); *260 and Falsetti v. Commissioner,85 T.C. 332, 356-357 (1985). Here we have decided that no deduction is allowable to the Corporation for depreciation or amortization of the goodwill acquired. The fact that a corporation is not entitled to a deduction in connection with a payment, does not automatically result in a constructive dividend to a shareholder(s). Palo Alto Town and Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977). That principle is especially cogent in a situation where, as here, there is a business purpose for the payments. Although, as respondent points out, no liability for payment of the weekly accounts to Don's parents was reflected on the corporate return, the "list of purchased clients" was reflected in various increasing amounts, beginning with $39,200 for the 1972 year. The U.S. Corporation Income Tax Return, Form 1120, for Corporation's initial year (1972), in composite, reveals that the tangible and intangible assets of the accounting practice were transferred by Don to Corporation. The absence of an entry for the future obligations to Don's parents may have been an oversight or an accounting judgment *261 as to its includibility. We have difficulty accepting the respondent's assumption that Don retained the liability but transferred the intangible asset which, at that time, represented the "goodwill" of nearly 119 clients. We cannot allow respondent to separate the obligation to pay from the ownership of the asset and the payor of the obligation under these circumstances. The payments to acquire the already incorporated assets are clearly a business need of the corporate entity. If these payments were merely support payments to Don's parents, we would likely reach a different conclusion. We find that the payments herein did not inure directly to Don's benefit, but instead were payments clearly connected with the conduct of Corporation's business activity. To reflect the foregoing, Decision will be entered for petitioners in docket No. 14999-84.
Decision will be entered for respondent in docket No. 15000-84.
Footnotes
1. The parties have stipulated for purposes of this case that as of mid-1964 the standard tables reflected a life expectancy for Don's father and mother of 13.6 years and 17.8 years, respectively.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
3. Originally, sec. 1.167(a)-3, Income Tax Regs., was part of T.D. 6182, 1956-1 C.B. 98, and it was republished in T.D. 6500↩, filed Nov. 25, 1960. See 1960-2 C.B. VII.
4. In any event, petitioners did not present sufficient evidence to carry this burden or properly explain why depreciation was not claimed and/or ascertainable from the outset in 1964.↩