**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**SEABOARD FINANCE COMPANY et al., Respondents.**

**SEABOARD FINANCE COMPANY et al., Cross Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Cross Respondent.**

**Nos. 20159–20174.**

United States Court of Appeals
Ninth Circuit.

Oct. 5, 1966.

Richard M. Roberts, Acting Asst. Atty. Gen., Meyer Rothwacks, David O. Walter, Ralph A. Mupip, Lee A. Jackson, Fred R. Becker, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Austin H. Peck, Jr., H. Hal Visick, Latham & Watkins, Los Angeles, Cal., for respondents.

Before JOHNSEN,* BARNES and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge:

The Commissioner of Internal Revenue filed these consolidated petitions for review of decisions of the Tax Court involving federal income taxes for fiscal years ending in 1955, 1956, 1957 and 1958. The taxpayers, Seaboard Finance Company and fourteen of its subsidiaries (Seaboard), all engaged in the small loan business, filed cross petitions.

The Tax Court had the problem of determining how much, if any, of the amount paid by Seaboard in acquiring other small loan businesses was attrib-

---

* Harvey M. Johnsen, of the Eighth Circuit, sitting by designation.

utable to good will or other elements of value for which depreciation deductions are not allowed. The Commissioner is not satisfied with the way the Tax Court solved that problem. Seaboard's cross petitions are protective in nature, no affirmative relief being sought if we affirm the Tax Court's decisions.

During the tax years in question, Seaboard's program of rapid growth resulted in the purchase of fifty-five small loan businesses. In connection with each purchase the company paid an amount in excess of the face value of the loans outstanding and the fixed assets acquired. Seaboard treated the excess purchase price, referred to herein as the "premium," as part of the depreciable cost of acquiring the loan accounts. Accordingly, it sought to depreciate the premium over the average useful lives of the loan accounts, namely, three years for secured loans and five years for unsecured loans.

The Commissioner disallowed the depreciation deductions, and proposed deficiencies in the aggregate amount of $621,000. He did so on the ground that the entire premium was paid for good will or other elements of value which are non-depreciable.[1] The Tax Court, however, found that only thirty percent of the total premium was attributable to good will and other non-depreciable elements of value and therefore not subject to a depreciation deduction. The court held that the remaining seventy percent of the

premium was attributable to the loan accounts and was therefore depreciable over the average useful lives of those accounts. Accordingly, the Tax Court redetermined the aggregate deficiencies at about $202,000.

It is undisputed that the premium was derived by evaluating the individual loans to be acquired in connection with the purchase of each small loan business. Employees of Seaboard performed the evaluation by a procedure known in the industry as "spreading." It consisted of listing in columns the number of each loan contract, the name of the borrower, the principal balance due and a rating or classification of the individual contract. The classification symbols were A+, A, B, C, D and E.

In classifying an individual contract the person making the spread examined the contract itself and the file relating thereto, any credit check made on the borrower and any other pertinent information concerning the particular borrower. Among the items of information examined were the borrower's age, nature and length of his employment, whether his wife was employed, size of his family, and his payment record. Each contract was then classified as A+, A, B, etc., and a total of the balance in each classification was computed.

The person spreading the accounts then added to the total balance of the A+ accounts a percentage of the total balance

1. The Commissioner relied upon the following statute and regulation:

Section 167 of the Internal Revenue Code of 1954, 26 U.S.C. § 167 (1964):

"!67. Depreciation

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

Treasury Regulations on Income Tax (1954 Code, 26 CFR:

"Sec. 1.167(a)–3 Intangibles.

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of

income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trade mark and trade name expenditures, see section 177 and the regulations thereunder."

which, in the purchases here involved, generally ranged between fifteen and thirty percent. No percentage or premium was added to the total principal balance of loan contracts classified as A. The total principal balances of loan contracts in the other classifications (B, C, D and E), were discounted by percentages ranging from twenty-five to seventy-five percent.

In determining the aggregate value of the loan contracts to be purchased, the person making the spread added to the aggregate principal balances owing on all loan contracts the premium on the A+ contracts, and subtracted the discount, if any, on the other contracts. The resulting figure was the amount which was offered for the loan contracts in bargaining with the seller for the loan business. Seaboard paid a net premium for the loan contracts of every business it purchased. The net premium on each purchase was entered on Seaboard's books in a separate account entitled "Premium Paid on Purchased Accounts," and depreciated over three- and five-year periods.

 The facts reviewed above indicate that Seaboard paid the premium as a part of the cost of acquiring the loan accounts. The fact that the premium was part of such cost, however, does not resolve the question of whether the premium, or any part of it, represented payment for good will. Notwithstanding that it was a cost of acquisition, the premium constituted payment for good will if, and to the extent that, it represented elements of value usually associated with good will.

This court has recognized that " * * the essence of goodwill is the expectancy of continued patronage, for whatever reason." Boe v. Commissioner, 9 Cir., 307 F.2d 339, 343. The Tax Court recently defined good will as "the probability that old customers will resort to the old place" without contractual compulsion. Brooks

v. C.I.R., 36 T.C. 1128, 1133. This definition has also been used in the Fifth and Seventh Circuits. See Commissioner v. Killian, 5 Cir., 314 F.2d 852, 855; Karan v. Commissioner, 7 Cir., 319 F.2d 303, 306. In Meeker v. Stuart, D.C.D.C., 188 F.Supp. 272, 275, aff'd 110 U.S.App.D.C. 161, 289 F.2d 902, the district court stated that good will may be defined as " * * * the habit of customers to return to the concern with which they have been previously dealing." See District of Columbia v. ACF Industries, Incorp., 122 U.S.App.D.C. 12, 350 F.2d 795, 799.

In the Tax Court the Commissioner contended that the premium was attributable primarily to the good prospects for loan renewal, an element of good will. This contention was based upon the fact that the main source of a small loan company's new business is its present customers. According to undisputed evidence, a customer of a small loan company will usually refinance his loan two or three times before finally paying it off.

The experience of Seaboard was cited as typical. In the taxable year ended September 30, 1957, Seaboard made sixty percent of its loans to present customers who refinanced their accounts. This same percentage held true for 1958. Another ten percent of the loans made by Seaboard in those years represented new business from former borrowers who had previously paid off their loans.

The Commissioner further contended in the Tax Court that part of the premium was paid for the benefit of continuity enjoyed by the purchaser of a going business, this element of value also representing a non-depreciable asset.[2] He argued that one who purchases an existing small loan business avoids the start-up costs necessary to put a newly-established small loan office on a paying basis.[3] The undisputed evidence shows

2. In its reply brief, the Commissioner states that this "going concern" value, while different from good will, is nevertheless non-amortizable, citing Cornish v. United States, 9 Cir., 348 F.2d 175, 185.

3. The language of the Second Circuit in United States Industrial Alcohol Co. v. Helvering, 2 Cir., 137 F.2d 511, 513, supports the Commissioner's contention:
"In such an industry—for that matter

that a small loan office which is started from "scratch," will generally have to operate for about two and a half years before it begins to make a profit.

The Commissioner argued to the Tax Court that the acquisition of a customer structure which could be solicited for allied services was a third element of good will which was paid for by the premium. For example, customers acquired by Seaboard were sold or solicited for credit life insurance and for Seaboard's "ever-ready chek" program. Seaboard also offered its customers an "all-in-one" package loan. Letters were sent° to newly acquired customers encouraging them to drop into one of Seaboard's offices and borrow more money.

In view of all of these asserted elements of good will associated with the purchase of the small loan businesses, the Commissioner urged the Tax Court to accept his determination that the entire amount of the net premium was attributable to good will or other unamortizable elements of value.

As noted above, the Tax Court did not agree that the entire amount of the net premium was attributable to good will or other non-depreciable elements, allocating only thirty percent of the premium to good will and other non-depreciable elements of value.

▇ In its opening brief to this court, the Commissioner did not specify as error any of the Tax Court's findings of fact. See Rule 18(2) (d), Rules of the United States Court of Appeals for the Ninth Circuit. He has also told us in his reply brief that neither the facts nor the

inferences to be drawn from those facts are in dispute, and that we therefore are not called upon to determine whether any of the findings of fact are clearly erroneous. See Rule 52(a), Federal Rules of Civil Procedure.[4] The Commissioner contends that the only question involved in this case is a legal one, namely:

" * * * whether this [Ninth Circuit] Court was correct in holding that a payment for the 'expectancy of continued patronage' is non-amortizable goodwill (Boe v. Commissioner, [9 Cir.] 307 F.2d 339, 343), or whether the Tax Court was correct in permitting taxpayers [in this case] to amortize the portion of the premium paid for 'expectancy of continued patronage.' "[5]

In so formulating the issues presented on this review the Commissioner has misconceived the Tax Court decisions. The Tax Court agreed with the Commissioner's contention that the elements of value referred to above—good prospects of loan renewal, avoidance of start-up costs, and the benefits of a customer structure—constituted good will or were otherwise unamortizable. The Tax Court opinion, quoted in part below, expressly states that these and some other elements of value associated with the premium constituted good will or going concern value not subject to depreciation deductions:

" * * * there are certain facts which show to our satisfaction that at least part of the excess payment or premium was paid for goodwill or going concern value. These facts are: (1) Loans were renewed from 2 to 3 times on the

in any industry—continuity of sales is a condition of continued existence; once they stop, it is extremely hard, if not impossible, to start up the business again. Therefore the power to sell over the period immediately after the business is taken over, insuring as it does against such a break, has a value quite independent of any profit that may be got from those particular sales."

4. Rule 52(a) is applicable in tax review proceedings where the petitioner challenges the findings of fact of the Tax Court. Commissioner v. Duberstein, 363

U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

5. The Commissioner was referring to his contention that the premium was attributable "primarily" to the good prospects for renewal of the loans. While he does not, at this point in his reply brief, refer to his previously mentioned contention that there were also two other elements of unamortizable value associated with the premium, we do not understand that he is abandoning those contentions. Inferentially, however, he asserts that these, too, present only questions of law.

average; (2) some of Seaboard's new loan business comes from the refinancing of loans held by their present customers; (3) over 10 percent of Seaboard's new business comes from former customers who have previously paid up their loans; (4) customers acquired by Seaboard were sold or solicited for the purchase of life insurance and for the use of the 'ever ready chek' program; (5) some of the contracts between Seaboard and the sellers contain covenants not to compete, thus indicating the transfer of some goodwill; (6) start-up costs were avoided, thus enabling Seaboard to commence business at once by stepping into the shoes of the sellers and begin making a profit; (7) many of the loan companies acquired were old established businesses; and (8) customer structure is an element of goodwill and has an intangible asset value of its own."

It follows that, as between the Tax Commissioner and the Tax Court, no legal question is presented of the kind urged by the Commissioner. The Tax Court recognized only thirty percent of the premium as unamortizable value, not because it believed that the value based on customer prospects and the like are subject to depreciation deductions, but because it found that seventy percent of the premium represented payment for other elements of value which do not constitute good will or the like, and are therefore subject to depreciation deductions.[6]

In its findings of fact, the Tax Court described the elements of value associated with the premium which were here subject to depreciation:

"First, if the overall quality of the loan contracts being spread compared not with each other but with loan contracts in other loan offices, is good, the percentage of premium will be relatively higher. Second, the percentage or premium is influenced by the effective yield obtainable on the loan contracts under the laws of the State in which the loan contracts are located. Because of variations between the States in the maximum permissible interest rate, a loan contract with a given borrower in a given amount will yield a higher return in one State in comparison with another. Third, supply and demand affect the percentage or premium. If there is competition for the purchase of loan contracts, the person making the spread may increase the premium on that account in order to give better assurance of being able to complete the purchase."

The Commissioner does not contend that these elements of value constitute good will or are otherwise unamortizable, nor as pointed out above, does he challenge any findings of fact.[7] Likewise, the Commissioner has not made an evidentiary attack upon the allocation made in the Commissioner's "Ultimate Findings" as between the two categories of value, namely, thirty percent to good will and going concern value, and seventy per-

---

6. In making its premium allocation, the Tax Court noted that several of the usual good will characteristics were missing in this case—interest in sellers' personnel, interest in sellers' locations, and intention to utilize sellers' names. The Tax Court, however, did not hold that, because these elements of good will value are absent in this case, the premium or any part of it therefore represents value other than good will. The court was merely engaged in a process of reviewing the customary elements of good will, rejecting those which are inapplicable and accepting those which are applicable. This was appropriate procedure. As the District of Co-

lumbia Circuit said in Burke v. Canfield et al., 74 App.D.C. 6, 121 F.2d 877, 880, " * * * good will must be dealt with legally in connection with the business of which it has been said to be parasitic."

7. The Commissioner stated in his brief that there is no evidence to support the view that any of the premium was paid because of a high effective yield of individual loans. However, in view of his failure to specify any of the findings of fact as error, and his insistence that no question of fact is presented in this court, we will not review the evidence concerning this matter.

cent to other elements of value which are subject to depreciation deductions.

The Tax Court pointed out in its opinion that neither party offered evidence in support of specific allocations. The court further stated:

"* * * by applying the principle announced in Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930), the record supports an appropriate allocation. After considering all of the facts established in the record relevant to such allocation, and applying our own judgment thereto, we have arrived at the allocations set forth in our ultimate findings."

In the Tax Court the Commissioner cited United Finance and Thrift Corp. of Tulsa v. Commissioner of Internal Revenue, 4 Cir., 282 F.2d 919, in support of his position that the entire premium paid by Seaboard should be allocated to non-amortizable elements of value. In its opinion, the Tax Court stated why it believed the *United Finance* case was distinguishable from the *Seaboard* case now before us. In so doing, however, the Tax Court was not taking issue with the Commissioner's legal premise, but sought only to distinguish the facts of the two cases.

■ Since no legal question of the kind suggested by the Commissioner is actually presented, and since the findings of fact have not been questioned, we hold that the Tax Court did not err in the respects urged by the Commissioner.

The Commissioner also renews an alternative argument which was rejected by the Tax Court. Stated succinctly, he argues that, assuming that all or a part of the premium can be assigned to the loan contracts, such part of the premium may nevertheless be viewed as the cost of acquiring the customer structure of a going business, which is an "indivisible asset" with an indeterminate useful life.

The Commissioner asserts that the customer structure should be treated as an indivisible asset with an indeterminate useful life (and hence, not depreciable) because although its value may fluctuate from time to time as contracts expire and are replaced by new ones, this should not be regarded as a process of exhaustion, but as a process by which a continually existing asset is kept intact.

■ The rationale and purpose of the "indivisible asset" rule is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased. This doctrine makes it possible to strike down depreciation deductions for amounts which should properly be allocated to good will.

■ In this case, Seaboard apparently made an honest attempt to value the premium paid, under the impression that a depreciation deduction would be allowed. Each contract was individually analyzed to determine its ultimate worth. Although part of the premium was correctly held by the Tax Court to be good will, it does not appear that the remaining portion of the premium should be declared non-depreciable on the basis of the "indivisible asset" rule.

One of the reasons given by the Tax Court for rejecting this alternative argument, was that the "indivisible asset" rule is inapplicable where the purchase price was derived by appraising the value of each individual asset. The Tax Court cited Boe v. Commissioner, 9 Cir., 307 F.2d 339, for this proposition.

In *Boe*, the taxpayer was unable to value each of the individual medical contracts which were there purchased, and as a result no part of the total purchase price was assigned to any contract or group of contracts. There was simply bargaining between the parties as to what would be paid for the business as a whole. Under these circumstances the Tax Court, and this court, applied the "indivisible asset" rule, and therefore held that it was not shown that the capital asset involved—the contract medical business—diminished in value each time there was termination of a particular contract. See Boe, supra, 307 F.2d at 343.

We indicated in *Boe*, however, that the result would have been different if, as in

our case, the individual contracts had been separately appraised:

"Since the cost of any particular contract cannot be determined, it is no help to taxpayer that he demonstrated that a given number of contracts actually terminated in a particular year. The consequence of such a termination was left open in ThriftiCheck, supra, [ThriftiCheck Service Corp. v. Commissioner, 2 Cir., 287 F.2d 1] but there a definite cost could be assigned to each contract purchased." (Boe, 307 F.2d at 343–344.) [8]

 In our case a definite cost was assigned to each contract purchased and the circumstances which called for application of the "indivisible asset" rule in *Boe* are therefore not present.

The Commissioner has advanced several other reasons why the "indivisible asset" rule should be applied here. We have given consideration to each reason, but we are not persuaded that this is a case calling for application of that doctrine.

The Commissioner contends that the premium which Seaboard is seeking to depreciate is not "for a 'determinable amount of income' over an 'ascertainable period.'" He contends that since no contract could run over thirty-six months under any state law, these amounts could not be depreciated over a three- to five-year period.

Experience had indicated, however, that secured loans ran off the books on the average of three years whereas unsecured loans, where possibilities for renewal are greater, remained on the books an average of five years. These figures apparently comply with the Treasury Regulations on depreciation. Treas.Reg. § 1.167(a)–3 (1956). These regulations permit a depreciation deduction for the cost of intangible assets if the life of the

intangible can be estimated with reasonable accuracy.

 Not only the courts, but also the Commissioner, have agreed that a contract right with a limited useful life is the proper subject of an amortization deduction. 1954–1.Cum.Bul. 6, acquiescing in Stewart Title Guar. Co., 20 T.C. 630 (1953). It is unnecessary that such a contract be limited to its duration on paper when taxpayer can demonstrate, as he did here, that the contract will be extended over a longer period of time.

As noted at the outset of this opinion, Seaboard's cross petitions are protective in nature and, in the event of affirmance on the Commissioner's petitions, Seaboard does not press its cross petitions.

Affirmed on the petitions and cross petitions.

---

8. The Fourth Circuit reached a result similar to *Boe* in Dodge Bros., Inc. v. United States, 4 Cir., 118 F.2d 95. In *Dodge Bros.*, the intangible asset involved, a model and design of a "proved car," was held to be just one part of a bulk purchase of assets. The court found this bundle of assets, which it termed "goodwill," had no reasonably estimatable useful life and was therefore non-depreciable. For analysis of *Boe* and *Dodge Bros.*, see Parmelee Transportation Company, v. U. S., Ct.Cl., 351 F.2d 619, 625.