CONCORD CONTROL INC., Successor in Interest to K-D LAMP COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Concord Control, Inc. v. Commissioner
Docket Nos. 3206-72, 3207-72.
United States Tax Court
T.C. Memo 1976-301; 1976 Tax Ct. Memo LEXIS 98; 35 T.C.M. (CCH) 1345; T.C.M. (RIA) 760301; September 27, 1976, Filed; as amended November 18, 1976. *98 The taxpayer's predecessor in interest purchased a going concern pursuant to a contract in which the purchase price was allocated among the various assets acquired. Held, the allocations were the bona fide result of arm's length negotiations and the amounts so allocated are the basis of the respective assets. Held further, the portion of the basis of each asset representing the amount paid for going concern value determined. Such portion represents an amount paid for an intangible asset with an indeterminable useful life and is not amortizable. Held further, the useful lives of certain assets determined. Michael I. Saltzman and William T. Sherwood, for the petitioner. Juandell D. Glass, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge : Respondent determined deficiencies in petitioner's federal income taxes as follows: Docket No. *
Taxable Period
Deficiency
3206-72
2/18/64 - 12/31/64
$202,744
1/1/65 - 12/31/65
143,322
1/1/66 - 11/30/66
135,486
3207-72
12/1/66 - 11/30/67
54,473
The primary issue for our consideration is whether *99 petitioner's predecessor in interest properly computed the adjusted basis of the assets it acquired in connection with its purchase of the K-D Lamp Division of the Duplan Corporation in 1964. The resolution of this issue ultimately turns upon whether or not goodwill was one of the assets so acquired and upon a determination of the proper method by which the total purchase price is to be allocated among the assets purchased. The other issue for decision requires us to determine the useful lives of certain depreciable assets acquired in the 1964 purchase. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Concord Control Inc., had its principal office in Cincinnati, Ohio at the time it filed its petitions herein. Petitioner's predecessor in interest, K-D Lamp Company, filed corporate income tax returns for its taxable years ended December 31, 1964, December 31, 1965, November 30, 1966, and November 30, 1967 with the district director of internal revenue, Cincinnati, Ohio. In 1959, K-D Lamp Company was owned by Northeast Capital (hereinafter *100 Northeast), the other assets of which were the Automatic Burner Company and a 33 percent stock interest in the Mack Truck Company. At that time Northeast, a publicly owned company listed on the American Stock Exchange, was controlled by the following individuals: Christian Johnson (hereinafter Johnson), Harold Fierman (hereinafter Fierman), William Kaelin (hereinafter Kaelin), and Stuart Hedden (hereinafter Hedden). These individuals also controlled the Duplan Corporation (hereinafter Duplan), a public corporation engaged in the textile business, and were on the board of directors of both Duplan and Northeast. [1]
In 1959 these individuals decided to sell K-D Lamp Company and Automatic Burner Company to Duplan in order to facilitate a desired merger of Northeast and the Mack Truck Company [2] and to avail themselves of Duplan's large net operating loss carryover. To protect themselves in the event that the minority stockholders of either corporation filed a derivative suit, Manufacturer's Appraisal Company (hereinafter MAC) was engaged to value the physical assets of K-D Lamp Company and Automatic Burner Company. These companies were *101 then sold to Duplan at a price that approximated the fair market values thereof as appraised by MAC. [3]
After the 1959 sale K-D Lamp Company was operated as a division of Duplan and continued to engage in the trade or business of manufacturing and selling automotive safety equipment.The K-D Lamp Division of Duplan (hereinafter K-D) had five major competitors that manufactured a complete line of safety lighting equipment, and approximately twenty minor competitors the products of which included one or more items also manufactured by K-D. To a large degree the products of K-D and its competitors were markedly similar and were interchangeable. As a result of this similarity and the absence of a prominent display of the K-D name on its products, the K-D name was not instrumental in furthering K-D's ability to market its line. Rather, the factors that ultimately determined whether or not K-D would be able to either acquire *102 or retain a particular customer account were price, service, and quality. Prior to 1959 K-D's policy was to bypass wholesale distributors and to sell directly to automotive parts jobbers. However, in 1959, in compliance with a decision entered by the Federal Trade Commission, K-D commenced selling directly to wholesale distributors. [4] *103 The result was a dramatic shift in K-D's channel of distribution during the period 1959 to 1964 which found K-D selling its line to the following customer groups: (1) Original manufacturers of trucks who in turn either mounted the K-D products on their own trucks or resold the K-D products to other vehicle dealers for use as replacement parts. This group, which included the Mack Truck Company, accounted for approximately 12 percent of K-D's 1963 sales. (2) Heavy duty fleet specialists who resold the K-D products primarily to fleet distributors. This group accounted for approximately 28 percent of K-D's 1963 sales. (3) Warehouse distributors who resold the K-D products to jobbers. This group, which included the National Automotive Parts Association (hereinafter NAPA), accounted for approximately 60 percent of K-D's sales in 1963. In 1963 NAPA, a trade association of warehouse distributors, was K-D's largest customer accounting for 32 percent of all K-D's sales in that year. [5] *104 The absence of an agreement requiring either NAPA or its members to purchase K-D's products compelled K-D to pursue the following course of action in marketing its products to the NAPA chain. K-D initially negotiated with NAPA headquarters in Chicago with respect to the price of each item it proposed to sell to NAPA members. Such negotiations would result in either the rejection or approval of a particular item and in the latter case a determination of the price at which such item could be sold. [6] It was then incumbent on K-D to dispatch its sales force to the warehouses of the NAPA members in an effort to sell those items that had been sanctioned by NAPA headquarters. Not only were the members under no obligation to buy from K-D, but they ofttimes carried products of K-D's competitors. Notwithstanding the obvious benefit that K-D derived from its "affiliation" with NAPA, such relationship also carried with it corresponding burdens. Not only did NAPA bargain for price reductions, but it also required K-D to contribute to an advertising campaign, [7] to increase its sales force and to participate in various programs. K-D acceded to these demands in an effort to retain the NAPA account. In 1963 Duplan's controlling interests decided to sell K-D and Automatic Burner Company in order to pave the way for the sale of Duplan. Kaelin informed Andrew Stone (hereinafter Stone) of *105 this fact but, due to their friendship, instructed him to negotiate the purchase with Johnson. [8] *106 Accordingly, Stone and Johnson engaged in negotiations concerning the sale and purchase of K-D. Initially, Stone proposed that payment be made on the deferred payment method but finally acquiesced in Johnson's demand for a full cash payment of the purchase price which was determined as follows: (1) After studying the certified financial statements of K-D and Duplan, Stone agreed to pay book value for the accounts receivable and inventory. (2) Stone initially offered to purchase the physical assets of K-D at book value while Johnson set the asking price at an amount equal to the fair market value of these assets. MAC was again retained and made a fair market value appraisal of the physical assets as a going concern. This appraisal served as a basis for further negotiations and the parties subsequently agreed that these assets would be sold at 89.5 percent of the appraised value. At no time during the course of the negotiations was the subject of K-D's goodwill discussed.[9]
The following is a summary of the procedures employed by MAC in conducting certain portions of the 1963 appraisal: (1) The value of the machinery and equipment was determined by subtracting the depreciation observed by the on-site appraisers from the reproduction cost new. The reproduction cost new of standard items, which included freight charges, engineering fees, installation fees, and extras, was priced in Philadelphia from catalogs. The reproduction cost new of nonstandard items was determined by the on-site appraisers. [10]
(2) The values of the tools, dies, jigs, and fixtures were also valued by the reproduction cost new less depreciation method. Dies were classified first as either active, semiactive or inactive and further classified as either simple, compound, or progressive.On-site appraisers then, based on information *107 supplied by K-D personnel, determined the number of hours required to reproduce each type of die, the hourly cost of reproduction and multiplied these figures to arrive at a reproduction cost new for each die. To this figure no depreciation was taken on active dies, 50 percent depreciation was taken on semiactive dies, and 90 percent depreciation was taken on inactive dies. [11] In February 1964, Interim Lamp Company was organized with a paid in capital of $1,000,000.00 represented by common stock issued to Stone in the amount of $600,000.00 and preferred stock in the amount of $400,000.00 issued to Chromcraft Corporation. On February 28, 1964, pursuant to a purchase agreement, Interim Lamp Company purchased K-D for $3,590,369.11 plus an assumption of liabilities in the amount of $236,757.17 or a total purchase price of $3,827,126.28. The source of the funds for the acquisition was the paid in capital of the Interim Lamp Company and a bank loan in the amount of $2,650,000.00. Immediately following the acquisition Interim Lamp Company's name was changed to The K-D Lamp Company. [12] *108 The aforementioned purchase agreement is set forth in pertinent part, below: Duplan is presently engaged in the business of manufacturing and selling lamps, signal lights and accessories for automobiles, trucks and other vehicles, through its K-D Lamp Division (hereinafter called the "Division"). Purchaser desires to purchase and acquire, and Duplan desires to sell and convey to Purchaser, as of the close of business on January 31, 1964 (hereinafter called the "Transfer Date") substantially all of the assets (other than cash) of the Division, including its business as a going concern. * * *
* * * Duplan is conveying * * * to Purchaser * * * all of its right, title and interest in and to the following assets of the Division: (a) All accounts receivable and all inventories of raw materials, work in process, finished goods and goods in transit, including those reflected in the balance sheet of the Division as of January 31, 1964 (a copy of which has heretofore been delivered to Purchaser). (b) All land, buildings, machinery, equipment, tools, dies, molds, jigs, patterns, fixtures and furniture, wherever located, including all such assets reflected in the balance sheet of the *109 Division as of January 31, 1964 (referred to above) or listed in the appraisal by the Manufacturer's Appraisal Company, dated December 30, 1963 (a copy of which has heretofore been delivered to the parties hereto) with only such changes as shall have occurred in the ordinary course of business since the date of such appraisal.
(c) All amounts due from officers and employees, prepaid insurance and deferred charges made in the ordinary course of the Division's business. (d) The State of Ohio deposit premium relating to workmen's compensation. (e) All inventions, patents, patent rights, trade secrets, engineering drawings, designs, models and all manufacturing and sales data and information, pertaining to the business of the Division. (f) The business of the Division as a going concern, and all files, books and records of account pertaining thereto, and all trade names, trademark and trademark registrations used in the business of the Division. (g) All the stock of certain "name-holding," inactive subsidiaries of Duplan, more fully described in Schedule A hereto. (h) The labor union agreements, pension plan, supplemental unemployment benefit plan, employee employment contracts, equipment *110 lease agreements, group life insurance and Blue Shield Blue Cross insurance plans and policies and certain other insurance policies more fully described in Schedule A hereto. (i) All contracts and orders not heretofore described made in the ordinary course of the Division's business for the purchase of materials, supplies, and services and for the sale of products. (j) All other assets of the Division of whatever kind or nature * * *. It is also understood that Raymond P. Vogele is to perform services for Purchaser similar to those currently being performed by him as general manager of the Division pursuant to his Employment Agreement with Duplan dated as of October 1, 1959 (a copy of which has been delivered to Purchaser), such services to be performed from the date hereof to the end of the term of his full-time employment thereunder. * * *
3. Purchase Price. At the closing this day, Purchaser is delivering to Duplan a certified or bank check to Duplan's order in the amount of $3,590,369.11 (the receipt of which is hereby acknowledged), constituting, together with the assumption of the liabilities specified in Schedule B in the amount of $236,757.17 provided for in Section 2, *111 payment in full of the purchase price for the Purchased Assets, determined as follows: (a) For the accounts receivable referred to in Section 1(a), the sum of $592,692.89. (b) For the inventory referred to in Section 1(a), the sum of $1,100,446.23. (c) For the land, buildings and other assets referred to in Section 1(b), taken at 89.5 percent of appraised values, [13] the sum of $2,109,644.78.
(d) For the items referred to in Section 1(c) hereof, the sum of $13,341.38. (e) For the item referred to in Section 1(d) hereof, the sum of $11,000.00. (f) For the remainder of the Purchased Assets, the sum of $1.00. As of January 31, 1964, the book value of K-D's assets as reflected on Duplan's books were as follows: Asset
Book Value
Accounts Receivable (Net)
$ 592,692.89
Inventory
1,100,446.23
Land
48,375.00
Buildings
671,984.28
Machinery and Equipment
305,211.77
Tools, dies, jigs, molds, and
fixtures [14] *112 79,748.37
Office Furniture and Equipment
52,430.06 Following the sale K-D Lamp Company, in setting up its books to reflect the purchase, applied the sales price as follows: Assets Purchased and Liabilities Assumed by Interim Lamp Company (name changed to K-D Lamp Company) as of January 31, 1964, per Agreement with Duplan Corporation dated February 28, 1964
Assets Purchased
Accounts Receivable - Trade
$601,493.50
Accounts Receivable - Other
American Compressed Steel Co.
$ 1,869.30
Tom Rose (Note - Inventory)
4,330.09
6,199.39
$607,692.89
Less: Reserve for Doubtful Accounts
15,000.00
Net
$592,692.89
Inventories -
Raw Materials - Purchased Parts
$364,339.77
Work in Process
Material
$122,668.88
Labor
24,164.01
Overhead
68,867.38
215,700.27
Finished Goods
Material
$328,367.00
Labor
49,880.29
Overhead
142,158.90
520,406.19
1,100,446.23
Due from Officers & Employees -
Permanent Expense Advance
Walter Listerman
$ 200.00
James P. McHugh
200.00
Earl Mourgan
200.00
Donald Underhill
200.00
Arthur Patton
532.52
1,332.52
Deposit Premium - State of Ohio
Workmens Compensation
11,000.00
Fixed -
Real Estate
Land
*
$68,020.00
Buildings
15
572,800.00
$640,820.00
Personal Property
General Machinery
8
$479,240.28
Power Wiring
8
38,019.60
Pipe & Fittings
8
16,979.94
Tools
3
14,919.65
Special Tools
3
51,838.40
Jigs & Fixtures
3
594,241.52
Plating Equipment
5
63,566.48
Material Handling
8
93,109.54
Plant Furniture
8
31,734.91
Office Furniture
8
48,658.47
Office Machines
5
32,300.55
Pneumatic Tube System
5
1,109.80
Intercommunication System
5
832.35
Auto Call System
5
826.08
Time Recorder System
5
1,447.21
1,468,824.78
2,109,644.78
$3,815,116.42
Unexpired Insurance
Policy No.
96-217663 Maryland Cas. Co.
$ 668.00
Liability
28-193921 Maryland Cas. Co.
131.00
Auto-Non Owner.
93-256897 Maryland Cas. Co. Steam
734.73
Boiler
9603612 Federal Ins. Co. Comp. Bond
479.93
31-811210 F.I.A. U. & O.
1,987.92
31-811209 F.I.A. Real & Personal
6,015.14
SP 767915 Home Ins. Co. Pattern
76.80
Pleater
AA 153731 Cont. Cas. Co. Travel
15.34
Accident
Cont. Cas. Co. Travel Accident
495.00
10,603.86
Prepaid Show Expense
1,405.00
Other Assets
1.00
Total Assets -
$3,827,126.28
Liabilities Assumed
Accounts Payable
$148,853.35
Employee Savings Bonds
2,100.25
Accrued Wages
14,830.82
Accrued Commissions
9,393.91
Accrued Contr. to Pension Fund
4,558.19
Accrued Contr. to S.U.B. Fund
6,061.88
Real Estate Tax
9,300.00
Personal Property Tax
2,500.00
Accrued Legal Expense
1,250.00
Accrued Vacation Allowance
27,988.77
Accrued Bonus
9,920.00
Total Liabilities -
236,757.17
Purchase Price
$3,590,369.11 *
*113 In March 1966, K-D Lamp Company retired the preferred stock owned by Chromcraft Corporation thereby rendering Stone its sole shareholder. At sometime in 1966, Falrock Corporation, which owned all the stock of Concord Control Inc., sold its stock therein to Stone who then caused a merger of the K-D Lamp Company into Concord Control Inc. For convenience, Concord Control Inc., Interim Lamp Company, and the post 1964 purchase, K-D Lamp Company, will all be referred to as Petitioner. The K-D Division of Duplan will continue to be referred to as K-D. In connection with an audit of petitioner's tax returns and a criminal investigation of Stone, George Williams (hereinafter Williams), an engineer employed by the United States Treasury Department, prepared a valuation report in which he found that petitioner had acquired considerable goodwill in connection with the 1964 purchase, appraised the various assets so acquired, and allocated the purchase price among these assets in order to determine their adjusted basis for tax purposes. The following is a synopsis of the methods used *114 by Williams in preparing his report which is the basis for the notices of deficiency herein. (1) Williams found that K-D possessed goodwill in the amount of $1,191,595.00. He arrived at this figure by the following steps: (a) He first calculated that K-D had an average return on tangible net worth of 26.6 percent for the years 1962 and 1963. The basis for these calculations were Pro Forma Balance Sheets of Duplan which revealed the following. K-D LAMP COMPANY DIVISION OF DUPLAN CORPORATION PRO FORMA STATEMENT OF EARNINGS
4 months
Years Ended September 30
ended
1960
1961
1962
1963
Jan. 31,
1964
Net sales
$5,400,723
$4,730,816
$4,833,932
$4,810,549
$1,617,069
Cost of sales
3,539,613
3,375,681
3,432,218
3,231,132
1,101,347
Shipping, selling
and
administrative
expenses
916,560
795,114
787,120
823,718
327,545
4,456,173
4,170,795
4,219,338
4,054,850
1,428,892
Earnings before
944,550
560,021
614,594
755,699
188,177
tax
Computed taxes on
income
486,000
286,000
315,000
388,000
93,000
Net earnings
$ 458,550
$ 274,021
$ 299,594
$ 367,699
$ 95,177
Cash
$ 588,946
$ 756,241
$ 561,744
$ 706,765
$ 419,951
Accounts
559,451
525,082
471,689
583,024
592,695
receivable
Inventories
1,252,606
1,226,582
1,331,289
1,173,685
1,100,446
Other assets
14,006
17,351
19,037
16,980
24,340
Property, plant
and
equipment - Net
1,730,137
1,520,417
1,293,032
1,187,889
1,154,379
Total Assets
$4,145,146
$4,045,673
$3,676,791
$3,668,343
$3,291,811
Accounts payable
$ 175,509
$ 174,389
$ 131,573
$ 116,510
$ 150,953
Accrued expenses
180,535
184,661
136,050
155,734
152,426
Accrued federal
293,000
193,000
208,000
244,000
93,000
tax
Long term debt
3,000,000
2,500,000
2,000,000
1,500,000
1,500,000
[15] *115 Shareholders'
496,102
993,623
1,201,168
1,652,099
1,395,432
equity
Total liabilities
and
Shareholder
$4,145,146
$4,045,673
$3,676,791
$3,668,343
$3,291,811
equity
The years 1960, 1961 and 1964 (annualized) were excluded since Williams considered them abnormal. (b) Williams then computed the average percentage return on tangible networth on an industrial average based upon "Statistics of Income - 1963, Corporation Income Tax Returns with accounting periods ended July, 1963 - June, 1964." [16] He utilized 5,452 tax returns in computing the ratio of K-D's average return for 1962 and 1963 to be 3.5 times that of the industrial average. (c) By dividing K-D's 1962-1963 average income ($333,647.00) by 3.5, he arrived at the average income for the industry and calculated the excess income to be $238,319. Williams then capitalized this figure at a 20 percent rate using a multiplier of 5. (2) Williams determined the value *116 of the accounts receivable to be $595,166. He found the book value thereof to be 13 percent of K-D's total sale for 1964 and concluded that 13 percent of K-D's 1964 bad debt charge would be a reasonable reserve for the book value of the receivables. He further discounted the book value by 1 percent for time and 1 percent for expenses of collection. (3) Williams valued the inventory at $1,153,636. He first calculated the percentage of each dollar of every K-D sale that represented profit (6.9 percent) and cost of goods sold (93.1 percent). From the statistics reports that he utilized in his goodwill valuation, he extracted the pertinent data and found that the "industry norm" was 2.4 percent net profit on each dollar of sales volume. Using these figures, he calculated that the $1,100,446 book value of K-D's inventory would produce sales in the amount of $1,182,004 and concluded that a hypothetical buyer similarly situated would pay $1,153,636 for the same inventory thereby producing a 2.4 percent profit for said hypothethical willing buyer. (4) Williams placed a value on the tools, dies, jigs, and fixtures in the amount of $196,236. He began his analysis by placing a 10 year *117 useful life on these items and multiplied this figure by $39,247.29 (the figure he found to be the average annual cost of such assets), thereby arriving at his estimate of $392,472.90 [sic] as the new cost of the tools, dies, jigs and fixtures on January 31, 1964. He then assumed the annual age of each item was 5 years, utilized a 50 percent depreciation factor and calculated the fair market value of these items to be $196,236. (5) Williams estimated the machinery, equipment, and office furniture to be 50 percent of the value of that shown on the 1963 MAC appraisal.He based this finding upon the sales price of certain items resold by petitioner, upon K-D's Ohio property tax returns and proceedings in connection therewith, and upon prices tendered to him by Harry Wallenhorst of the Cincinnati Machinery Company for certain items set forth in the 1963 MAC appraisal. On its returns for the years in issue, petitioner utilized as its adjusted basis in the assets acquired in the 1964 sale the portion of the total purchase price which it had previously allocated to the respective assets in setting up its books. In computing depreciation deductions with respect to these assets, petitioner *118 claimed useful lives on jigs, dies and fixtures of 4 years new and 3 years used, claimed useful lives on machinery and equipment of 12 years new and 8 years used, and claimed useful lives on office furniture and equipment of 5 to 10 years. The useful life of tools, dies, and jigs is a function of the care with which they are used and the continuing popularity of the part they are designed to make. Frequently K-D found it necessary to repair dies within 1 year. However K-D generally was able to use its tools, dies, and jigs approximately 5 years. Respondent, in his notices of deficiency, determined first that petitioner's allocation of the purchase price was erroneous in that the portion thereof that had been allocated to the tangible assets was excessive and that $1,064,965 of the purchase price was attributable to goodwill. He further determined that the useful lives of the machinery, equipment, tools, dies, jigs, office furniture, and office equipment was 10 years. In accordance therewith he made the following adjustments to petitioner's tax liabilities for the years at issue: It is determined that the depreciation allowable on buildings and equipment acquired February 1 or *119 February 18, 1964 at a total cost of $1,108,357 and additions thereto for the taxable period ended December 31, 1964 and taxable year 1965 and the taxable period ended November 30, 1966, is set forth in detail in Exhibits A through A-4 and summarized as follows: Claimed on
Revised
Adjustment
Return
1964
$358,514
$85,168
$273,346
1965
$404,246
$100,288
$303,958
1966
$387,000
$97,044
$289,571 A similar adjustment was made for petitioner's taxable year ended November 30, 1967. It is determined that the losses sustained from the disposition of depreciable assets acquired February 1, 1964, and claimed on the returns herein were excessive because the basis of these assets was overstated as explained in the General paragraph of this schedule. The revised computation of those losses is shown in Exhibit B and summarized as follows: Claimed on
Your Return
Revised
Adjustment
1964
$477
$118
$359
1965
$2,972
$1,252
$1,720
1965
$6,449
$3,330
$3,119
* * *
A similar adjustment was made for petitioner's taxable year ended November 30, 1967. It is determined that your 1964 taxable income is increased by the following adjustments which result from the reallocation of the basis of assets acquired as set forth in the General statement: *120 Inventory at 2/18 per return
as additional cost of goods sold
$1,100,446
Inventory 2/18 revised
1,031,039
Overstated cost of sales by
reason of overstated inventory
$69,407
New decrease in receivables
reported on return
(592,693. less 451,395.)
$141,298
Revised decrease due to basis
of receivables
(531,918. less 451,395.)
80,523
Additional income-Receivables
collected
$60,775
Prepaid items reflected in returns
@ 2/1/64
$13,341
Prepaid items revised
11,923
Additional income
$ 1,418
The following is a summary of the values and adjusted basis of K-D's assets as claimed by petitioner and determined by respondent: FMV Per
Basis Per
FMV Per
Petitioner's
Williams
Notice of
Asset
MAC Appraisal
Claimed Basis
Report
Deficiency
Accts Receivable
Not valued
$ 592,693
$ 595,166
$ 531,917
Inventory
Not valued
1,100,446
1,153,636
1,031,039
Land
$ 76,000
68,020
76,000
67,924
Buildings
640,000
572,800
640,000
571,987
Machinery & Equipment
776,683
695,132
347,566
310,630
Tools, Dies, Jigs,
Fixtures
738,547
661,000
196,236
175,382
Furniture and Office
Equipment
125,915
112,694
56,346
50,358
Prepaid Items
Not valued
13,341
13,341
11,923
Goodwill
Not valued
$1.00
1,191,595
1,064,465
Workman's Comp.
Deposit
Not valued
11,000
11,000
11,000 We must decide which of these sets of figures, if either, *121 is proper. OPINION The issue before us is the ofttimes litigated and rather vexing question of the proper basis of assets acquired in connection with the purchase of a business.More precisely, in the context of the factual patterns before us, we must decide whether the contract for sale and the allocation of the purchase price therein represent a bona fide reflection of the agreement and intent of the parties to that transaction, or whether the allocation was a device by which petitioner sought to disguise substantial payments for intangible assets, to wit, goodwill. Petitioner, in seeking to have us sustain its position, advances several arguments that merit consideration. Petitioner's first argument, factual in nature, entails a rather novel interpretation of the transaction herein and the tax ramifications flowing therefrom. Simply stated, petitioner contends that the purchase, as reflected in the contract for sale, was both in form and substance an asset acquisition and not the acquisition of an entire business. To buttress this contention, petitioner points out that the price of each asset was separately negotiated and that the total contract price is but the total of the separately *122 negotiated asset prices. Hence, petitioner asserts that respondent acted upon the erroneous assumption that the total contract price was a lump-sum price for a going business to be allocated among the assets in accordance with their respective fair market values. Petitioner's alternative argument runs as follows: Should we find that the purchase of K-D was in substance an acquisition of a business, the contract and allocations found therein were the culmination of arm's-length bargaining and are true reflections of the intention of the contracting parties; therefore, petitioner continues, the cost of each asset as set forth in the contract is its cost basis for tax purposes, whether petitioner struck a good or poor bargain. Therefore, respondent erred in reallocating the total contract price among the various assets obtained as set forth in his notices of deficiency. Unsurprisingly respondent takes an entirely different view of both the facts and the law applicable to the issue before us. Succinctly stated respondent contends that petitioner paid $3,827,126.28 for a going business thereby acquiring both the tangible and intangible assets thereof including goodwill with a value *123 of $1,191,595. He urges that the allocation set forth in the contract for sale was merely a device designed to obtain for petitioner a higher basis in the depreciable assets and that it was, therefore, proper for him to ignore the contractual allocation and to compute the proper adjusted basis of the assets obtained by reallocating the total purchase price among them in accordance with their respective fair market values. We turn first to petitioner's initial contention which, stripped to its bare essentials, is that it purchased the assets of K-D but not K-D itself.We agree that if petitioner acquired only assets, at separately negotiated prices, its basis in each asset would be the price therefor as set forth in the contract for sale. Section 1012, I.R.C. 1954. Further, the basis so computed would be the basis for the computation of depreciation deductions to which petitioner would be entitled with respect to those assets subject to an allowance for depreciation. Section 167(g), 1011(a). However, the fallacy in petitioner's argument lies with its premise that it acquired only assets. A careful consideration of the evidence convinces us that it cannot be gainsaid that petitioner *124 acquired K-D as a going business in 1964. It is undisputed that Duplan desired to sell and that Stone wished to purchase K-D as an operating entity; that petitioner acquired, with certain minor exceptions, substantially all of K-D's assets and retained, at least, its key personnel; and that the sale caused little or no interruption in the operation of K-D's business. The evidence clearly demonstrates that the shift in K-D's ownership was the sole change emanating from the sale thereof in 1964. Although not stated in these terms, petitioner's argument equates the relevant transactions with one in which it purchased the same assets from myriad sellers. We simply cannot agree. Evidently petitioner bases this view on the fact that an appraisal of K-D's assets was made and utilized as a basis for negotiations prior to the parties' meeting of the minds on the price ultimately to be paid. Implicit in this reasoning is the notion that this course of conduct is somehow unique, thereby differentiating the transaction herein from the normal purchase of a going business. To the contrary we fail to see an alternative method by which a reasonable businessman, genuinely concerned with his *125 economic future, would acquire a business. A determination of the value of each asset separately is surely a reasonable starting point for a determination of the value of all the assets collectively. We believe that the record supports but one conclusion, that petitioner acquired K-D as a full operating entity. Turning next to petitioner's second argument, petitioner seeks to have us recognize the contractual allocations as written. However, it is well-settled that it is proper for respondent to look through the form of a transaction to its substance in order to determine the correct tax consequences thereof. A taxpayer cannot contractually preclude respondent from attacking an allocation which has no basis in economic reality. Gregory v. Helvering,293 U.S. 465 (1935); Dixie Finance Company, Inc. v. United States,474 F. 2d 501, 504 (5th Cir. 1973). It is thus our task to weigh the evidence and to determine the realities of the transaction as it unfolded in 1963 and 1964. In so doing our ultimate inquiry is whether the contract as written truly reflected the intent of the parties thereto or whether any portion of the payments set forth therein was, in fact, paid for K-D's goodwill. *126 O'Dell & Co.,61 T.C. 461, 467 (1974). We agree with petitioner that the contract for sale was the result of arm's-length negotiations and fairly reflects the intention of the parties thereto.Petitioner and Duplan were unrelated corporations and Stone, who owned substantially all of the stock of petitioner, owned no stock in Duplan and had no familial relationship with any of the individuals in control of Duplan. Although Stone was on friendly terms with Kaelin, Kaelin disqualified himself from participation in the negotiations which were in large part conducted between Johnson and Stone. In view of the fact that Johnson was the majority stockholder of Duplan, we think it obvious that out of self-interest alone he would have sought to obtain the best terms and conditions possible. This is borne out by Kaelin who testified as follows: A: Mr. Johnson owned more than 50 percent of the stock of Duplan at that time, and I had known Mr. Johnson for 15 to 20 years at the time he died. And Mr. Johnson was a very accurate man, but he wasn't given to making special concessions to anybody. Q: If K-D Lamp had a valuable - had valuable goodwill, would Mr. Johnson have sold that goodwill for *127 $1.00? A: The answer is no. It is further supported by Stone, the substance of whose testimony was that both he and Johnson sought to negotiate the best possible deal for their respective principals. Moreover, and most importantly, the portion of the purchase price allocated to the tangible assets was less--not more--than the values placed thereon by MAC. While we recognize that the MAC appraisal is not correct in all respects, it was a bonafide, independent appraisal conducted in accordance with accepted appraisal methods without interference on the part of either Duplan or petitioner. Further, it is clear that the negotiating parties accepted the MAC valuations as a genuine reflection of the worth of the assets in question and utilized these values as a basis for the negotiations that followed.Thus, even in these instances in which respondent has demonstrated the MAC appraisal to be in error, the portion of the total purchase price derived from such error nevertheless represents the intended quid pro quo of the parties. The fact of the matter is that the record is devoid of any evidence that would tend to support a finding of collusion between Duplan and petitioner and fully *128 supports petitioner's contention that the contract for sale reflects the bargain as actually struck by the parties thereto. For this reason we think petitioner tendered payment only for those assets to which a portion of the purchase price was allocated in the contract for sale at the price so allocated, and is entitled to have the intention of the parties, as expressed in their agreement, respected. [17]Annabelle Candy Co. v. Commissioner,314 F. 2d 1, 7 (9th Cir. 1962), Republic Steel Corporation v. United States,94 Ct. Cl. 476 (1941). In so holding, we recognize that unlike those cases in which we have upheld the validity of payments tendered pursuant to *129 a covenant not to compete, the tax interests of petitioner and Duplan were not adverse. Cf. Rich Hill Insurance Agency, Inc.,58 T.C. 610 (1972); J. Leonard Schmitz,51 T.C. 306 (1968), affd. sub. nom. Throndson v. Commissioner,457 F. 2d 1022 (9th Cir. 1972). As such, we have not attributed to the agreement the weight to which we would otherwise give it had the parties been adverse in the tax sense. Supporting our conclusion herein are our doubts whether K-D possessed any goodwill in 1964 that petitioner could have purchasedhad it desired to do so. A precondition to the possession of transferable goodwill is a finding that the seller's business is of such a nature as to provide the purchaser with the expectancy of both continuing excess earning capacity and competitive advantage or continued patronage. Wilmot Fleming Engineering Co.,65 T.C. 847, 861 (1976). Excess earning capacity in and of itself is insufficient to demonstrate the transfer of goodwill. A. T. Miller,39 T.C. 940, 953 (1963), affd. 333 F. 2d 400 (8th Cir. 1964). Here, K-D at the time of the sale was engaged in an industry fraught with both a high degree of competition and little customer loyalty, manufacturing *130 a product line virtually identical to those of its competitors. In particular, K-D was continually compelled to accede to the demands of NAPA, its largest customer, in order to retain that account. The loss thereof in 1969, despite the rather obsequious role played by K-D and petitioner during the term of their respective relationships with NAPA, amply demonstrates that petitioner had no reasonable expectancy of continued customer patronage flowing from its purchase of K-D. Furthermore, while the absence of an allocation of any meaningful portion of the purchase price in the contract for sale is not determinative on the issue of the existence of goodwill, such fact together with the absence of any negotiations with respect to goodwill strongly militates against the existence of goodwill. Wilmot Fleming Engineering Co.,supra at 860. We also note as a relevant factor that neither petitioner nor Duplan, in setting up their respective books, treated goodwill as an asset. John Winthrop Wolcott,39 T.C. 538 (1962). Notwithstanding our conclusion that petitioner acquired no goodwill in connection with its purchase of K-D, it clearly did acquire an ongoing business that was earning money, *131 had a trained staff of employees, had a product line presently ready for sale and equipment ready for immediate use. Simply stated, the purchase price paid by petitioner for the various assets acquired in 1964 included substantial going concern value which, as distinguished from goodwill, is the increase in the value of assets due to their existence as an integral part of an ongoing business. The portion of the purchase price for each asset attributable to the going concern value is nondepreciable and must, therefore, be excluded from petitioner's basis therein in computing the depreciation deductions to which it is entitled. Northern Natural Gas Company v. United States,470 F. 2d 1107, 1110 (8th Cir. 1973), cert. den. 412 U.S. 939 (1973); Winn-Dixie Montgomery, Inc. v. United States,444 F. 2d 677 (5th Cir. 1971); United States v. Cornish,348 F. 2d 175 (9th Cir. 1965); Computing & Software, Inc.,64 T.C. 223 (1975). The record is not entirely clear on this issue and contains no satisfactory formula for dividing the price paid for each asset between the base price of that asset and its going concern value. However, an allocation is required. Based upon a careful consideration *132 of the record we think we are justified in making the following allocations: Purchase
Going Concern
Depreciable
Asset
Price
Value
Basis
Buildings
$572,800
$ 57,280
$515,520
Machinery &
Equipment
695,132
139,026
556,106
Tools, Dies, Jigs,
Fixtures
661,006
132,200
528,806
Office Equipment and
Furniture
112,694
22,544
90,150
Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930); Commissioner v. Seaboard Finance Company,367 F. 2d 646 (9th Cir. 1966). With respect to the useful lives of the machinery, equipment, tools, dies, jigs, furniture and fixtures, the burden of proof is on petitioner. Welch v. Helvering,290 U.S. 111 (1933). Petitioner proffered expert testimony sufficient to convince us that respondent's determination as it pertains to the useful lives of the tools, dies, and jigs is excessive. It appears that respondent, in placing a 10 year useful life on these items, assumed that many of the same tools, dies, and jigs were on hand both in 1959 and 1968, since the numbers representing the dies in the MAC appraisals are to a large extent identical. However, it is clear from the evidence presented by petitioner that such numbers represent functions performed by the dies rather than a particular die. The *133 testimony at trial blurred the distinction between the lives of new and used tools, dies, and jigs. Accordingly, we hold with respect to the particular tools, dies, and jigs at issue herein that they had useful lives of 5 years. With respect to the machinery, equipment, furniture, and fixtures we find petitioner's evidence inadequate to sustain its burden of proof and hereby uphold respondent's determination as it pertains to the useful lives thereof. In view of the foregoing, Decisions will be entered under Rule 155. Footnotes
*. These deficiencies were determined against petitioner as successor in interest to the assets and liabilities of K-D Lamp Company.↩
1. Johnson was the majority stockholder of Duplan.↩
2. The record does not disclose whether or not the merger was consummated. ↩
3. The 1959 MAC appraisal was a fair market value appraisal of the going concern value of the physical assets of the K-D Lamp Company. MAC did not appraise the intangible assets of that company.↩
4. As a result of this shift, the number of K-D's after market customers dropped from approximately 4,000 in 1959 to approximately 300 in 1964, and its gross profit per sale also dropped during this period.
5. The following is a summary of K-D's total sales and sales to NAPA for the calendar years 1963, 1964, 1965 and 1966: ↩
Year
Total Sales
NAPA Sales
NAPA % of Total
1963
$5,165,355
$1,665,445
32.2
1964
5,424,333
1,978,457
36.5
1965
6,118,914
2,353,749
38.5
1966
6,407,641
2,456,049
38.3
6. NAPA did not accept all products manufactured by K-D at various times from 1959 through 1969 (at which time NAPA terminated its "affiliation" with K-D). From time to time, NAPA discontinued carrying certain K-D products that it had handled previously.↩
7. Although it is not entirely clear from the record, it appears that K-D's advertising campaigns were no more extensive than those of its competitors.↩
8. Johnson died in Jnuary 1964 prior to the closing of the sale. However, an agreement on the major issues to be negotiated was apparently completed at the date of Johnson's death. 9. Stone held no stock interest in Duplan and the negotiations were entirely at arm's length.↩
10. The 1959 MAC appraisal was used as a reference point for the 1963 appraisal. Certain items of machinery and equipment appear in both although such items no longer had any value at the time of the latter appraisal.↩
11. No real market exists for used dies.↩
12. Interim Lamp Company commenced its operation for K-D on February 18, 1964.
13. This reference pertains to the values contained in the 1963 MAC appraisal.↩
14. Molds, tools, dies, jigs, and fixtures purchased by K-D during the period October 1, 1959 through 1963 are as follows: Period
Purchases
10/1/59-10/60
$ 44,178
1961
34,054
1962
59,885
1963
25,469
Total
$163,586
During this period K-D incurred toolroom expenses on these items, in the form of labor and burden as follows: ↩
Period
Labor
Burden
Total
10/1/59-1960
$21,238.58
$37,167.52
$ 58,406.10
1961
17,434.39
49,688.01
67,122.40
1962
18,464.94
52,625.07
71,090.01
1963
19,898.65
56,711.15
76,609.80
*. Years of remaining life. ↩
*. Paid by Check #1 Interim Lamp Company drawn on Marine Midland Trust Co. of New York.↩
15. However, the books and records of K-D for the period from September 30, 1962 through January 31, 1964 show that there was no outstanding long-term debt, but that on December 31, 1964 there was a long-term debt in the amount of $1,800,000.00. The books and records of K-D show interest on debt from February 1, 1964 through December 31, 1964 in the amount of $115,875.53.
16. U.S. Treasury Department - Internal Revenue Service Publication No. 16.↩
17. Respondent has cited several cases for the proposition that a lump-sum purchase price must be allocated among the various assets in accordance with their respective fair market values and at trial presented extensive evidence pertaining to the values thereof. We find these cases to be distinguishable in that in each such case either a contractual allocation was absent, was found to be a sham, or lacked such a relationship with economic reality that it could be fairly said not to have reflected the true intent of the parties.↩